Docusign Envelope ID: 0C8BFF73-4C56-4B6C-A402-8DEEF58F1DFB



STATE OF NEW YORK

COUNTY OF NEW YORK

## **CERTIFICATION**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English of the attached Expert Statement of Juan Antonio Stupenengo.

Signed by:

*Chris Duncombe*

DEE269506FDA441...

Chris Duncombe, Managing Editor
Lionbridge
03 March 2025 | 12:40 GMT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GLACIAL CAPITAL, LLC and TRSE
HOLDINGS LLC,

      Plaintiffs,

   v.

BANK OF THE PROVINCE OF
BUENOS AIRES,

      Defendant.

:
:
:
:
:
:  Case No. 24-cv-8156
:
:
:
:
:
:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## EXPERT DECLARATION OF JUAN ANTONIO STUPENENGO

Pursuant to 28 U.S.C. § 1746 and Rule 44.1 of the Federal Rules of Civil Procedure, I, Juan Antonio Stupenengo, declare as follows:

1. I submit this expert declaration in support of the motion to dismiss filed by the Bank of the Province of Buenos Aires.

2. I am a duly licensed attorney and authorized to practice in the Argentine Republic.

3. I earned my legal degree, with honors, from the University of Buenos Aires School of Law (**"UBA"**). I am a Specialist in Administrative Law and Public Administration, a qualification I also earned from UBA. In academia, I am a regular adjunct professor appointed by a competitive procedure, of the course on "Elements of Administrative Law," as part of the law program of the UBA School of Law, and also for the courses on "Institutions of Administrative Law" and "Fundamentals of Administrative Law" for the law program of the School of Legal Sciences of Pontificia Universidad Católica Argentina. At the graduate level, I am a professor

of subjects related to administrative law, including some related to state and administrative organization, for the graduate programs in administrative law at the National University of La Plata, National University of La Matanza, National University of Tucumán, "San Juan Bosco" National University of Patagonia, and, in private academic institutions, at Pontificia Universidad Católica Argentina, Universidad Austral, and Belgrano University. I am also a professor for the graduate program of the School of State Attorneys of the Office of the Treasury Attorney General of the Argentine Republic and the Public Attorneys' Training School of the Office of the Attorney General of the Autonomous City of Buenos Aires.

4. I am the vice-president of the Administrative Law Association of the Autonomous City of Buenos Aires and a member of the Ibero-American Regulatory Association. I am the author of the book "Ejecución judicial del acto administrativo [Legal Enforcement of Administrative Acts]" (Astrea, 2017), editor and co-author of the edited volume "Temas de Derecho Administrativo Sancionador [Topics in Administrative Law Sanctions]" (Editorial Platense, 2024) and the author of numerous articles and notes also related to the field of administrative law. I have presented at national and international conferences, having presented on topics related to administrative law—and, in many cases, related to state and administrative organization—both in Argentina and abroad.

5. For more than ten years I have had the honor to be listed among the most notable attorneys specializing in public law in Latin America as noted in the publications *Chambers & Partners*, *Best Lawyers* and *Legal 500*. In professional terms, after having served for more than ten years as a civil servant in the courts of the Argentine Republic—more specifically in the Federal Administrative Litigation Court and in the Administrative and Tax Litigation Court of the Autonomous City of Buenos Aires—I am currently a partner of the law firm Beccar Varela,

located in the Autonomous City of Buenos Aires, where I co-head the Administrative Law Department.

6. My *curriculum vitae* is attached as Exhibit 1 to this declaration (**Exhibit 1**, CV).

## EXECUTIVE SUMMARY

7. In chapter I of this declaration I explain that, according to the provisions of its Charter, the Bank of the Province of Buenos Aires is a self-governing and autonomous entity.

8. In chapter II of this declaration, I explain that the case law of the courts of the Argentine Republic has acknowledged the autonomous nature of the Bank of the Province of Buenos Aires.

## I. LEGAL NATURE OF THE BANK OF THE PROVINCE OF BUENOS AIRES: SELF-GOVERNING AND AUTONOMOUS ENTITY

9. To analyze the legal nature of the Bank of the Province of Buenos Aires ("**BPBA**"), we must begin with Decree Law 9434/79 of the Province of Buenos Aires, which approved BPBA's Charter (**"the BPBA Charter"**), which has—in turn— been successively amended by various laws issued by the Legislature of the Province of Buenos Aires; including laws 10,534, 10,766, 12,354, 12,695, 12,726, 13,072, 13,174, 13,786, 13,929, 14,062, 14,199, 14,331, 14,396, 14,552, 14,879, 15,225, 15,310, 15,394 and 15,480.

10. According to the provisions of BPBA's Charter, *"Banco de la Provincia de Buenos Aires, as a State-owned Bank, is a self-administered public entity, the origin, guaranties and privileges of which are set forth in the Preamble and in Sections 31 and 104 of the National Constitution,*

*in the National Law No. 1029 based on contractual matters, and in the laws of the Province."*[1] Its Charter makes it clear that this means that the BPBA is completely autonomous, governed exclusively by its Board of Directors: *"[p]ursuant to the provisions of article 1 hereof, the Province grants full autonomy to the Bank, which shall be exclusively administered by the Board of Directors."*[2]

11. In this way, BPBA's Charter recognizes that BPBA is **(I.1)** on the one hand, a self-administered public entity and **(I.2)** on the other hand, an autonomous institution.

## I.1. BPBA as a self-administered public entity

12. As described above, art. 1 of BPBA's Charter provides that *"Banco de la Provincia de Buenos Aires . . . is a self-administered public entity."*

13. According to the rules of administrative organization, self-government is one of the many forms of administrative decentralization, which implies, in turn, the recognition of the self-governing entity's own legal personality. This legal personality allows the self-governing entity—in this case, BPBA—to act in the judicial realm as a subject distinct from the Province of Buenos Aires. In this regard, the well-known author Juan Carlos Cassagne has said that *"where decentralization consists in the allocation of state duties to entities with independent legal status, separate and distinct from the central Administration . . . all entities under*

---

[1] Art. 1, BPBA Charter.

[2] Art. 8, BPBA Charter.

-4-

*administrative decentralization inherently imply self-government or the power to manage their own affairs."*[3]

14. Recognized authors of Argentine law understand that *"'self-government [autarquía]' means that a particular entity has the capacity to manage its own affairs"*[4] and that *"an autonomous entity . . . may issue its own bylaws, but, of course, such bylaws are subject to the provisions of the law creating the entity with regard to the approval by the central body."*[5]

15. According to the Argentine legal system, legal persons are created and governed by either public law or private law. According to the provisions of art. 147 of the Civil and Commercial Code of the Argentine Republic, the fact that BPBA is a *"self-administered public entity"*[6] only implies that the main aspects of its existence and activity—that is, its recognition, beginnings, capacity, functioning, organization, and purpose—are governed by the laws and statutes of public law rather than private law (as a private company would be). This is the case without prejudice to the fact that the rules of private law or others may be applicable to the legal relationships that BPBA enters into. Therefore, given that BPBA's Charter recognizes BPBA's nature as a self-administered public entity, this refers to the existence of a legal person distinct from the Province of Buenos Aires—with powers different from those constitutionally

---

[3] CASSAGNE, Juan Carlos, Curso de Derecho Administrativo [Course on Administrative Law], Thomson Reuters – La Ley, Buenos Aires, 13th updated and expanded edition, Volume I, p. 266. (**Exhibit 2**, Cassagne.)

[4] GORDILLO, Agustín, Tratado de Derecho Administrativo [Treatise on Administrative Law], Ed. Fundación de Derecho Administrativo, Buenos Aires, Volume 1, p. XIV-12. (**Exhibit 3**, Gordillo.)

[5] DIEZ, Manuel María, Manual de Derecho Administrativo [Manual of Administrative Law], Editorial Plus Ultra, Buenos Aires, Volume 1, p. 146. (**Exhibit 4**, Diez.)

[6] Art. 1, Decree Law 9434/79. (**Exhibit 5**, Decree 9434/79.)

and legally recognized for provincial entities—which prevents each from being liable for the actions of the other.

16. The separate legal personality of BPBA (as a self-administered entity) and the Province of Buenos Aires also leads us to understand that the one cannot be held liable for the acts or omissions of the other. In one case, the Supreme Court ("CSJN") held that the Federal State could not be validly held liable for the acts of the National Road Administration, one of its self-administered entities. According to the Court, the National Road Administration *"was constituted as 'an autarchic entity of public law, with the capacity to act privately and publicly' (Art. 1 of Decree-Law 505/58)"*[7]. As a result, the Court concluded that, by holding the Federal Government liable for the acts of the National Road Administration, the lower court had *"ignor[ed] the existence of a distinct legal person whose powers were not directly attributable to"* the Federal Government.[8]

**I.2. BPBA, as an autonomous institution of the Province of Buenos Aires.**

17. Art. 8 of BPBA's Charter also provides that *"[p]ursuant to the provisions of article 1 hereof, the Province grants full autonomy to the Bank, which shall be exclusively administered by the Board of Directors."*

---

[7] CSJN, "Ceballos, Estefanía Itatí et al. v. Dirección Nacional de Vialidad [National Road Administration] et al. re damages and losses," 09/20/2022, Judgments: 345:1025. (**Exhibit 6**, Judgments: 345:1025.)

[8] CSJN, "Ceballos, Estefanía Itatí et al. v. Dirección Nacional de Vialidad [National Road Administration] et al. re damages and losses," 09/20/2022, Judgments: 345:1025. (**Exhibit 6**, Judgments: 345:1025.)

18. Under Argentine law, *"autonomy is a higher form of political decentralization"*[9]. According to a recognized Argentine legal scholar, "*'autonomy' seems to add one further trait to the aforementioned capacity*" —i.e., self-administration—"*the capacity to* issue its own regulations *within the general regulatory framework as approved by a higher-ranking entity."*[10] The reason for this is that an autonomous entity enjoys "*capacity to issue its own basic regulations, and entails original regulatory power."*[11] A recognized Argentine author explains that, "[w]*henever autonomy is said to involve* the capacity to issue its own regulations in the context of a higher-ranking regulatory framework*, not only are the provinces included, but also self-governed entities, for these can, within the framework of their bylaws, also issue their own rules*"—or in other words—*"[S]elf-governance cannot be seen as the mere capacity to manage its own affairs, without being able to issue any rules whatsoever, but rather it always entails the issuance of regulations to govern the operation of the entity in question."*[12]

19. Now, recognizing that an entity has the capacity to issue its own regulations, the Argentine legal scholar BALBÍN[13] explains that an analysis of an entity's degree of autonomy must be carried out considering four guidelines, which are: **(a)** the procedure for appointing its

---

[9] CASSAGNE, Juan Carlos, op. cit., Vol. I, p. 266. (**Exhibit 2**, Cassagne.)

[10] GORDILLO, Agustín, op. cit., p. XIV-12. (**Exhibit 3**, Gordillo.)

[11] CASSAGNE, Juan Carlos, op. cit., Vol. I, p. 266. (**Exhibit 2**, Cassagne.) *See also* DIEZ, Manuel María, op. cit., p. 146 ("*the autonomous entity gives itself its own rules and is governed by them..*"). (**Exhibit 4**, Diez.)

[12] GORDILLO, Agustín, op. cit., p. XIV-12. (**Exhibit 3**, Gordillo.)

[13] BALBÍN, Carlos F, Tratado de Derecho Administrativo [Treatise on Administrative Law], Thomson Reuters – La Ley, Buenos Aires, 2015, 2nd updated and expanded edition, Volume II, p. 172–173. (**Exhibit 7**, Balbín, 2015.)

members, **(b)** control of political authorities over the entity; **(c)**; its system of financing; and finally, **(d)** its capacity for self-management and administration of its personnel.

20. Below we will see that in the case of BPBA, an analysis of the aforementioned points leads us to conclude that, in line with the provisions of art. 8 of BPBA's Charter, BPBA is a true autonomous entity which, as such, cannot be considered an *alter ego* of the Province of Buenos Aires.

**a)  How the Chairman and board members of BPBA are appointed**

21. The first guideline in analyzing autonomy is the procedure for appointing members of the entity. The legal scholar BALBÍN explains that *"[t]he members of autonomous entities must be designated through procedures which duly guarantee their capacity and aptitude, but, mostly, their independent judgment."* He adds that there are "*different methods*" of appointment that can guarantee the capacity and suitability of directors, such as "*appointment by the Executive itself; appointment by the Executive with the approval of the Senate; competitive selection process; elections through the vote of the sector's members; or appointment by the President upon the proposal of a specific sector, among many others.*"[14]

22. Now, as regards the appointment of the members of BPBA's Board of Directors—i.e., its Chairman and other directors—the Constitution of the Province of Buenos Aires and BPBA's Charter provide that they must be appointed by the Governor of the Province of Buenos Aires,

---

[14] BALBÍN, Carlos F., op. cit., p. 173. (**Exhibit 7**, Balbín, 2015.)

with the approval of the Senate.[15] In turn, BPBAs Charter adds that these directors must be *"duly qualified for their offices."*[16]

23. Regarding the requirement for Senate confirmation, the Supreme Court has stated—although with reference to the same requirement in the Constitution of the Argentine Republic for the appointment of federal judges—that the requirement of *"participation of both the Executive and Legislative Branches, is intended to strike an indispensable political balance because, as has been emphasized by very reputed legal scholars, the Senate's consent is 'an excellent check upon a possible presidential favoritism.' However, it is also intended to secure the best possible appointments: 'the Senate—points out Estrada—either consents or not, according to whether it believes the nominee has the necessary qualities and merits to faithfully perform the difficult tasks entrusted to them.'"*[17]

24. In sum, the requirement for Senate approval of those that the Governor of the Province of Buenos Aires appoints as Chairman and directors of BPBA is a constitutional and legal guarantee that individuals who do not meet the conditions of impartiality, independence, and suitability necessary for the exercise of the important and high-ranking positions in question

---

[15] Art. 18, Decree Law 9434/79. (**Exhibit 5**, Decree 9434/79.)

[16] Art. 18, BPBA Charter.

[17] CSJN, "Aparicio, Ana Beatriz et al. v. National State – National Supreme Court - Council of the Judiciary- art. 110 re: public employment", 21/04/2015, Judgments: 338:284. (**Exhibit 8**, Judgments: 338:284.)

will not be appointed to those positions. As mentioned above, this reinforces the autonomy of BPBA enshrined in art. 8 of its Charter.

**b) <u>The control of political authorities over the entity</u>**

25. The second guideline in analyzing autonomy is the control of political authorities over the entity. On this point, BALBÍN states that *"[a]utonomous entities must be controlled, as any other state entity, by the State's external auditing body (the Argentine External Accountability Office, AGN)"*[18]. In these cases, "*control by the Executive is minimal since there is no hierarchical relationship between the President and the entity.*"[19] Since there is no hierarchical relationship between the head of the executive branch and the entity, "*the Executive does not exercise command powers and consequently, it cannot, among many other things, give orders to entities, arrogate to itself the entity's issues, or resolve remedies. No State supervisory control exists either (that is, the power to intervene in its affairs).*"[20]

26. We will see that what the above-transcribed paragraph states—to explain the form and degree of control that autonomous entities must have in order to be truly considered as such—is undoubtedly true with respect to BPBA.

27. Article 159 of the Constitution of the Province of Buenos Aires establishes that the Court of Accounts of the Province of Buenos Aires—an external auditing body created and constitutionally located within the scope of the provincial legislature and not the executive branch—is responsible for *"inspect[ing] provincial or municipal offices managing public*

---

[18] BALBÍN, Carlos F., op. cit., p. 173. (**Exhibit 7**, Balbín, 2015.)

[19] BALBÍN, Carlos F., op. cit., p. 173. (**Exhibit 7**, Balbín, 2015.)

[20] BALBÍN, Carlos F., op. cit., p. 173. (**Exhibit 7**, Balbín, 2015.)

*finances and adopt[ing] any necessary measures to prevent any irregularities in the manner and as per the procedure established by law."*[21] In this sense, BPBA is subject to the external control of the Court of Accounts, which is only an auditing control to ensure that the Province's funds that are in the custody of BPBA, in its role as financial agent, are not misused.

28. Moreover, precisely due to the nature of BPBA—which, as we have seen, is a self-administered and autonomous entity—the decisions of BPBA's Board of Directors cannot be reviewed hierarchically by the Governor of the Province of Buenos Aires or by any of the ministers or lower entities of the centralized provincial administration. Furthermore, the Governor of the Province of Buenos Aires and its ministers do not have command power over BPBA's Board of Directors. To the contrary, as the aforementioned Art. 8 of the BPBA's Charter establishes, "*the Province grants full autonomy to the Bank, which shall be exclusively administered by the Board of Directors."*

**c)  The financing regime:**

29. The third guideline in analyzing autonomy is the entity's financing regime. To be considered an autonomous entity, the entity's financing regime must "*consist of resources from the Treasury and other resources of their own."*[22]

30. There is no question that BPBA has its own sources of financing apart from the funds received from the Province of Buenos Aires. It is apparent from BPBA's Charter that BPBA has resources from its own commercial banking and financial activity, such as, for example, loans

---

[21] Art. 159, paragraph 2, Constitution of the Province of Buenos Aires. (**Exhibit 9**, Constitution of the Province.)

[22] BALBÍN, Carlos F., op. cit., p. 174. (**Exhibit 7**, Balbín, 2015.)

and interest generated by financial operations, commissions from services rendered, resources from investments, security placements and income from its own assets.

31. BPBA can also receive funds from the Province of Buenos Aires via the Budget Law, drafted by BPBA itself. BPBA's Charter provides that BPBA is subject to the provisions of the Accounting Act with respect to the execution of its annual budget.[23] It is also apparent, based on Decree Law 7764/71, Accounting for the Province of Buenos Aires, which establishes that *"[t]his law shall govern all acts or transactions resulting in transformations of or variations in the Public Finances, and shall apply to all centralized and decentralized administrative State bodies.*[24]

32. As BPBA's Charter provides, BPBA's budget proposal must be prepared by BPBA's own Board of Directors and then submitted to the Provincial[25] Governor's Office so that the latter can submit the draft Budget Law before August 31 of each year to the Legislature of the Province of Buenos Aires, which has the power to approve the draft budget, but not to modify it.[26] In addition, this budget includes only expenses for BPBA's personnel and purchases of goods and services. It does not include expenses for its commercial activity. These expenses are included in a separate budget, which is not subject to the approval of the Legislature.

---

[23] Art. 12, BPBA Charter.

[24] Art. 1, Decree Law 7764/71, on Accounting in the Province of Buenos Aires. (**Exhibit 10**, Decree 7764/71.)

[25] Art. 24, BPBA Charter.

[26] Art. 5, Decree Law 7764/71, on Accounting in the Province of Buenos Aires. (**Exhibit 10**, Decree 7764/71.)

33. Although applying Decree-Law 7764/71 on Accounting to the BPBA implies that part of its financing may come from the public resources of the Province of Buenos Aires, it should be noted that, in fact, this budgetary allocation in favor of BPBA does not always take place. An analysis of the annual budgets approved by the Legislature of the Province of Buenos Aires for the years 2021 to 2023 (which was extended during 2024) shows that no funds have been allocated to BPBA. This undoubtedly also demonstrates the clear separation between the Province of Buenos Aires and BPBA.

34. However, what has been said so far about the budgetary financing of BPBA does not imply that the Province of Buenos Aires is empowered to avail itself of said funds at its own discretion. To the contrary, the Constitution of the Province of Buenos Aires itself clearly and expressly provides that *"[t]he Legislature shall not use any portion of the capital of Banco de la Provincia."*[27] One legal scholar explains that "*[c]apital from Banco de la Provincia must be understood as the mass of assets which such bank has to meet any undertaken commitments.*"[28] If the Constitution of the Province of Buenos Aires itself prohibits the legislature—the provincial body representing the citizenry—from having access to BPBA's

---

[27] Art. 50, Constitution of the Province of Buenos Aires. (**Exhibit 11**, Constitution of the Province.)

[28] MORENO, Guillermo Raúl, Comentarios a la Constitución de la Provincia de Buenos Aires, concordada y con notas de jurisprudencia [Comments on the Constitution of the Province of Buenos Aires, harmonized and with notes on case law] Editorial Librería Platense, La Plata, 2019, p. 304. (**Exhibit 12**, Moreno.)

funds, this prohibition applies even more so to the Government of the Province of Buenos Aires itself.

**d) <u>The capacity for self-administration and management of personnel</u>**

35. The fourth guideline in analyzing autonomy is the capacity for self-administration and management of personnel. In order to be able to be considered as such, *"[a]utonomous [e]ntities must have the necessary powers to manage and administer their material and human resources. That is, they must not only set up their goals and plan their policies but, also, be able to fulfill and comply with them."*[29]

36. As mentioned above, with respect to the management and administration of BPBA, art. 8 of BPBA's Charter provides that *"the Province grants full autonomy to the Bank, which shall be exclusively administered by the Board of Directors."*

37. In addition to the general provisions of the aforementioned art. 8, the articles of BPBA's Charter state that BPBA's Board of Directors has the power to decide, among other things, the following:

- the granting of loans or advances to the Province of Buenos Aires with guarantees, and ordering the sale of securities for its public debt in an amount of up to 15% of the current budget of the General Administration;[30]
- the granting of lines of credit to the Province of Buenos Aires to cover expenditures in the social interest for its residents and/or investments in infrastructure, of up to 20% of the current budget for the General Administration, against the corresponding guarantee offered by the Province of Buenos Aires;[31]

---

[29] BALBÍN, Carlos F., op. cit., p. 174. (**Exhibit 7**, Balbín, 2015.)

[30] Art. 11, BPBA Charter.

[31] Art. 11 bis, BPBA Charter.

- the determination of BPBA's capital stock[32]; the appointment of its Vice Chairman and Secretary;[33]
- the sale of real estate;[34]
- the granting of bonds or real guarantees and the payment of costs and fees needed to issue and obtain the listing of bonds on foreign markets and exchanges.[35]

38. Furthermore, in accordance with the provisions of the BPBA's Articles of Incorporation, the following are the exclusive powers and duties of the Board of Directors of the BPBA —without the Governor of the Province of Buenos Aires or any of the ministers having any influence on their exercise:

- agreeing to, establishing, authorizing, and regulating all operations, services, and spending of BPBA;[36]
- regulating loans that may be agreed to;[37]
- establishing the limits within which the General Administration, Department Administrations, and Branch Administrations may agree to loans;[38]
- calling extraordinary meetings of BPBA's Board of Directors;[39]
- appointing the General Manager, Deputy General Manager, and Department Managers, at the proposal of the Chairman;[40]
- approving the General Balance Sheet, Profit and Loss Statement, plan for the distribution of profits for the Fiscal Year, and the Management Report each year;[41]

---

[32] Art. 15, BPBA Charter.

[33] Art. 20, BPBA Charter.

[34] Art. 70, BPBA Charter.

[35] Art. 84, BPBA Charter.

[36] Art. 24, paragraph b, BPBA Charter.

[37] Art. 24, paragraph c, BPBA Charter.

[38] Art. 24, paragraph d, BPBA Charter.

[39] Art. 24, paragraph e, BPBA Charter.

[40] Art. 24, paragraph f, BPBA Charter.

[41] Art. 24, paragraph g, BPBA Charter.

- creating those reserves and provisioning funds that it sees fit to strengthen BPBA's financial situation;[42]

- issuing internal regulations;[43]

- establishing branches or representatives in the Argentine Republic and abroad;[44]

- designating correspondent banks in the areas of the Argentine Republic outside the capital region and abroad, regulating their relationships with BPBA;[45]

- authorizing the granting of general and special powers of attorney and stipulating the powers and authorities granted;[46]

- drafting BPBA's annual spending budget;[47]

- removing personnel, after a summary investigation, and regulating disciplinary measures with respect to personnel;[48]

- holding ordinary and extraordinary sessions at any of the offices of BPBA any time it is deemed necessary;[49]

- pursuing court actions with all legal authorities, without restriction;[50]

- to agree to discharges, grant waivers or enter into settlements with the debtors of any of the sections and to accept or acquire real estate or other property or securities in payment or defense of the claims of BPBA;[51]

- to acquire the real estate that is essential for the operation of BPBA's offices, subsidiaries or branches and to dispose of it when appropriate, as well as to sell the

---

[42] Art. 24, paragraph h, BPBA Charter.

[43] Art. 24, paragraph i, BPBA Charter.

[44] Art. 24, paragraph j, BPBA Charter.

[45] Art. 24, paragraph k, BPBA Charter.

[46] Art. 24, paragraph l, BPBA Charter.

[47] Art. 24, paragraph m, BPBA Charter.

[48] Art. 24, paragraph n, BPBA Charter.

[49] Art. 24, paragraph o, BPBA Charter.

[50] Art. 24, paragraph p, BPBA Charter.

[51] Art. 24, paragraph q, BPBA Charter.

real estate, furniture or other securities that BPBA has received in payment or has been awarded in defense of its claims or otherwise acquired by it;[52]

- to grant loans to legal entities in the private sector;[53]

- to inform the Budget and Tax Committees of the Chamber of Deputies and the Senate on the evolution and situation of debtors classified in an irregular situation;[54] and

- supervise the strict compliance by the different hierarchies of BPBA with the provisions of the Articles of Incorporation and the policies, rules, manuals and instructions on loan approval and recovery approved by the body, as well as the appropriate design and effective application of the internal control systems in this regard.[55]

39. What has been set forth up to this point regarding self-management and self-governance carried out by BPBA itself, in the hands of its Board of Directors, is not undermined by the fact that *"[t]he Bank [is] the financial agent of the Provincial Government."*[56] Rather, this status simply means that the Province contracts with BPBA, at a cost, to perform functions that the Province decides not to handle directly.

40. First, after BPBA's Charter stipulates that BPBA will handle *"collect[ion] of fiscal revenues and taxes,"* it adds that this will take place *"in accordance with the provisions of the pertinent agreement"* with the Province of Buenos Aires and that *"[t]he Government of the Province shall pay the Bank the cost of the services rendered as a commission for collecting fiscal revenues and taxes."*[57]

---

[52] Art. 24, paragraph r, BPBA Charter.

[53] Art. 24, paragraph s, BPBA Charter.

[54] Art. 24, paragraph t, BPBA Charter.

[55] Art. 24, paragraph u, BPBA Charter.

[56] Art. 9, BPBA Charter.

[57] Art. 9, paragraph a, BPBA Charter.

41. Second, BPBA's *"servic[ing] the Province's public debt in accordance with the directions given every year by the Ministry of Economy"*[58] also does not affect its autonomy with respect to the Province of Buenos Aires. In this case, BPBA acts as a typical administrative manager in the carrying out of debt servicing, a function that is usually performed by public or private banks for sovereign issuers, without this allowing us to conclude that there is confusion between the two.

42. The separation between the Province of Buenos Aires and BPBA is confirmed by the fact that the funds used to service the debt do not come from BPBA, but from the Province of Buenos Aires accounts that are administered by BPBA. This is clear from BPBA's Charter, which states that *"in order to fulfill this duty, the Bank shall withhold, out of the monies collected as taxes and fiscal revenues or received on account of the Province's revenue share in national taxes, all the amounts that, pursuant to said Ministry's specifications, shall be necessary for the payment of interest on and principal of loans, and other related expenses, which should be made under the terms and conditions set forth in the pertinent agreements."*[59] In other words, according to the above rule, before transferring funds to the Province of Buenos Aires, BPBA

---

[58] Art. 9, paragraph b, BPBA Charter.

[59] Art. 9, paragraph b, BPBA Charter. And while it is true that this provision also states that *"[s]hould the total collection be insufficient to ensure servicing, the Bank may advance the necessary funds",* it is then added—in order to reaffirm the separation between BPBA and the Province of Buenos Aires—that this shall be done through *"reimbursement from the monies subsequently collected under the items herein mentioned, so that all advances made for such purposes shall be settled on the last business day of each year"* (art. 9, paragraph b).

must automatically withhold from the revenues of the Province of Buenos Aires the money needed to pay its debt: i.e., interest, amortization and other expenses.

43. In sum, the autonomous nature of BPBA and its resulting separateness from the Province of Buenos Aires arise not only from the text of Article 8 of BPBA's Charter, but also from the regulations contained in those articles regarding the basic and fundamental aspects of such autonomy. These aspects include the procedure for appointing the Chairman and the other members of the Board of Directors, the lack of control on the part of political authorities over BPBA, BPBA's financing regime, and its capacity for self-management and direction.

## II. THE AUTONOMOUS NATURE OF THE BANK OF THE PROVINCE OF BUENOS AIRES ACCORDING TO CASE LAW OF THE ARGENTINE COURTS

44. The autonomy of BPBA and its subsequent separateness with respect to the Province of Buenos Aires can also be seen reflected in the case law of the courts of the Argentine Republic. More specifically, this is seen reflected in a series of legal precedents from which emerge **(II.1)** the distinct judicial treatment given to, on the one hand, cases where the party to the proceedings is BPBA and, on the other, those cases where the Province of Buenos Aires is the party; **(II.2)** that the law and courts' treatment of BPBA on tax and fiscal matters is not contrary to its autonomous nature; **(II.3)** BPBA's commercial and financial activity being subject to the same regulatory framework as any other financial or banking entity; **(II.4)** BPBA's commercial and financial activity being subject to the jurisdiction of the same courts as any other financial or banking entity; and **(II.5)** the legal treatment of the law and the courts regarding employees of BPBA is not contrary to its autonomous nature.

**II.1.  The distinct judicial treatment given by the courts in cases where the party to the proceedings is BPBA and versus cases where the party is the Province of Buenos Aires**

45. The autonomy of BPBA and its resulting separateness with respect to the Province of Buenos Aires can clearly be seen reflected in those legal precedents which attest to the differing treatment given by the courts to one versus the other.

46. The Supreme Court of the Argentine Republic has understood that, by virtue of the self-administering nature of BPBA, it is not possible to equate it with the Province of Buenos Aires in a judicial proceeding. In a case brought against BPBA, the Court—by reference to the opinion of the Public Prosecutor—declined to exercise its original jurisdiction on the grounds that the defendant in the case was not the Province of Buenos Aires—over which it could exercise such original jurisdiction—but instead was BPBA. The Court indicated that the Province of Buenos Aires could only be considered the party over which it could exercise original jurisdiction when it had participated *"nominally and substantially in the case—whether as plaintiff, a defendant, or a third party—"* and had *"a direct interest in the proceedings, so that the judgment rendered in the case will be binding on the Province (Judgments: 311:879 and 1822; 312:1227 and 1457; 313:144; 314:508, among many others)"*. The Court's opinion was that *"whether a province is a party to legal proceedings does not depend on the will of the litigants, as reflected in their formal submissions, but must be instead manifestly clear from the legal reality (Judgments: 307:2249; 308:2621; 314:405)"*. In that case, the Court understood that the province was not a party because *"the plaintiff filed its claim against the Bank of the Province of Buenos Aires"*, which is *"a self-governing institution under public law"* with *"the capacity to acquire rights and assume obligations,"* for which reason it has *"a legal and functional status of its own that sets it apart*

*from the local Government.*" The Court concluded that "*[u]nder such circumstances, . . . the Province of Buenos Aires is not party to the proceedings in the terms of section 117 of the National Constitution*" and declined its original jurisdiction[60].

47. Regarding this point, it is worth highlighting the erroneous and partial interpretation made by the Plaintiffs concerning the criterion established by the Supreme Court of the Argentine Republic in the case "Bank of the Province of Buenos Aires v. Argentine Nation", dated 03/15/1940[61]. The Plaintiffs cite this case to support their argument that the Supreme Court "has recognized" that BPBA's "attributes" "define and shape a State institution and not a particular bank in which its constituents or founders contribute capital for the purpose of creating a corporation authorized under the Commerce Code, to carry out known and common banking operations." (Complaint ¶ 62.)

48. First of all, it should be noted that this precedent has no application whatsoever to the case, since it has no bearing whatsoever on the issue under discussion here. In effect, that precedent dealt with whether Laws 11,586 and 11,682 were constitutionally valid insofar as they taxed the dividends paid by BPBA on the shares comprising its capital. The autonomy of  BPBA established in its Charter was not at play.

49. Notwithstanding the foregoing, it should be noted that the criterion arising in case law from that precedent cited by the Plaintiffs—far from validating their position—confirms that, according to the Court, BPBA has autonomy  with respect to the Province of Buenos Aires. In

---

[60] CSJN, "Romero, Gerardo Luis v. Bank of the Province of Buenos Aires et al. re: damages and losses," 09/07/1999, Judgments: 322:2105. (**Exhibit 13**, Judgments: 322:2105.)

[61] Judgments: 186:170. (**Exhibit 14**, Judgments: 186:170.)

this precedent, after making it clear that *"the tax exemptions established in the organic law of the Bank of the Province of Buenos Aires. . .shall be respected by the national authorities, as they enjoy the same supremacy as constitutional provisions over national and provincial laws, in accordance with Articles 31 and 104 of the Argentine Constitution, and Sections 2 and 3 of Law No. 1029,"* the Supreme Court added—in the part that matters here and reaffirming the autonomy of BPBA—that *"it would be erroneous to believe that, in exercising the constitutional power to establish a state bank, it is essential to place its administration directly in the hands of the public authorities."* As can be seen, far from supporting the opinion maintained by the Plaintiffs, in the precedents cited above, the Supreme Court of the Argentine Republic confirmed the autonomy enjoyed by BPBA with respect to the public authorities of the Province of Buenos Aires.

## II.2. The tax and fiscal treatment given by the law and the courts to BPBA is not contrary to its autonomous nature

50. The foregoing is not altered by the tax exemption that Article 4 of BPBA's Charter establishes in favor of BPBA's acts and instruments. This rule provides that "*[t]he Bank, its assets, acts and doings, agreements, contracts and transactions as well as the rights arising therefrom in its favor shall be exempted from any liens, taxes, charges or contributions of any nature whatsoever. The Bank shall only pay for water rates, charges for street lighting, cleaning and maintenance services, and improvement assessments.*"

51. The exemption provided for in the above rule is not based, nor could it be based, on the alleged and purported identity between BPBA and the Province of Buenos Aires—as the Plaintiffs insinuate (Complaint ¶ 63)—but rather on the recognition of the fiscal immunity of BPBA's acts and instruments against the federal form of state adopted by the Constitutional Convention

of the Argentine Republic. In fact, as legal doctrine explains, *"with the coexistence* [in the Argentine Republic] *of a central government and several local governments, each one with its own taxation powers, there arises the possibility—more real than remote—that each may tax the acts, contracts, instruments, means, and/or operations carried out by the others, thereby disrupting the normal functioning of their institutions and threatening their projected objectives. In this way, the institution in question* [the exemption] *seeks to prevent such disagreement, which is not always an easy task."*[62]

52. The above-mentioned meaning of the exemption set forth in Article 4 of BPBA's Charter has been recognized by the courts in several precedents. Indeed, when analyzing the validity of the National Treasury's claim to tax the profits from the shares corresponding to part of BPBA's capital and the interest on the bonds issued as a result of the mortgage loans granted, in the precedent "Bank of the Province of Buenos Aires v. Argentine Nation," dated 03/15/1940[63], the Supreme Court of the Argentine Republic recognized that the exemption provided for in BPBA's Charter is evidence of the Bank's independent nature. More specifically, it held that *"such exemptions, as a result of the powers granted to the Province by the 1859 Pact to legislate over its bank, shall be respected by national authorities, as they enjoy the same supremacy as constitutional provisions over national and provincial laws."* The Court added that the legal exemption was *"primarily intended to prevent any external authority from*

---

[62] DELLA PICCA, Pablo Hernán, "La inmunidad fiscal del Banco de la Provincia de Buenos Aires [The fiscal immunity of the Bank of the Province of Buenos Aires]," Revista Electrónica del Instituto de Investigaciones "Ambrosio L. Gioja" [Electronic Journal of the Institute for Research "Ambrosio L. Gioja"], Year IX, Number 14, 2015. (**Exhibit 15**, Della Picca.)

[63] CSJN, "Bank of the Province of Buenos Aires v. National State," 03/15/1940, Judgments: 186:170. (**Exhibit 14**, Judgments: 186:170.)

*exerting over* [the instruments of BPBA] *such a control* [the instruments of the BPBA]*, that it may cause them to lose the independence necessary to fulfill their purposes."*

53. The foregoing is to such an extent that the exemption provided for in Article 4 of BPBA's Charter is not absolute, but rather the courts have recognized exceptions. Indeed, on numerous occasions the Argentine courts have made exceptions to this exemption. This is what happened, for example, in "Bank of the Province of Buenos Aires v. General Tax Administration," dated 12/11/2007, in which the Supreme Court of the Argentine Republic validated the tax claim against BPBA for value added tax (Judgments: 330:4988) (**Exhibit 16**, Judgments: 330:4988.) In the same sense, in the precedent "Bank of the Province of Buenos Aires v. Boullhensen, Pedro A.,""dated 04/08/2021[64], that court rejected BPBA's claim, based on the exemption at issue, to be exempted from the payment of the court fee for filing a legal action.

54. None of what has been said so far is altered by the case law cited by the Plaintiffs in their Complaint. In fact, upon analyzing the precedent "Ignacio, Mónica Rosana v. Bank of the Province of Buenos Aires re: claim for compensation - public employment - matter of jurisdiction, art. 7 law 12,008", it can be seen that there the Supreme Court of the Province of Buenos Aires did not rule on the nature of BPBA; much less did it hold—as Plaintiffs argue— that BPBA constitutes a true body of the Province of Buenos Aires (*"constitute [a] true bod[y] of the State"*) (Complaint ¶ 64). Moreover, a brief review of that precedent shows that it is not

---

[64] Judgments: 344:421. (**Exhibit 17**, Judgments: 344:421.)

at all related to the case at hand, since there the Supreme Court of the Province of Buenos Aires limited itself to ruling on a jurisdictional dispute in a case for damages brought against BPBA for alleged workplace harassment.

55. It should be noted, therefore, that the exemption provided for in Article 4 of BPBA's Charter does not conflict with BPBA's autonomous nature.

### II.3. BPBA's commercial and financial activity is subject to the same regulatory frameworks as those of any other financial and banking entity.

56. BPBA's autonomy as a financial entity and its resulting separateness from the Province of Buenos Aires are also reflected in those precedents in which BPBA's commercial and financial activity is subjected to the same regulatory framework as any other financial or banking entity. Those frameworks are not applicable to the Province of Buenos Aires.

57. On this point, it is worth noting that—beyond its role as financial agent of the Province of Buenos Aires and the powers that this role implies, as described above—BPBA's Charter also empowers BPBA to conduct typical banking and commercial activities, such as granting loans to individuals and carrying out investments and transactions on the financial market.

58. Indeed, BPBA's Charter establishes that *"[t]he Bank shall, through its Banking Section, carry out all transactions that the Board of Directors may deem convenient and that by reason of their intrinsic nature are to be carried out within the ordinary course of business of banking institutions,"* adding that *"[i]t shall foster the national economy, giving priority to the Province's basic industries, and the monetary stability insofar as its actions may be affected*

*thereby.*"[65] In addition, the Charter empowers BPBA to *"grant special loans for the improvement of agriculture, forestry, livestock breeding, industry, fishing, the construction of silos and elevators, and other activities aimed at the development of the provincial economy, applying preferential rates and terms under the conditions set forth by its Board of Directors,"*[66] and to grant loans that *"may be applied to finance projects for Industrial, Agro-industrial and/or infrastructure Promotion within the territory of the Province of Buenos Aires."*[67]

59. The provisions of the above rules are clearly reflected in BPBA's banking and financial practices, since BPBA offers its customers and the general public the same products and services offered by any other bank in the financial system of the Argentine Republic, whether private or public, national or provincial.

60. In this sense, the separation between BPBA and the Province of Buenos Aires is also clear, since—as the courts have stated—by carrying out commercial activities, BPBA is subject to the rules that govern all commercial and financial activities in the Argentine Republic, just like any other banking entity. These rules include Law 21,526, the National Financial Entities Act; Law 25,246, the Prevention and Control of Money Laundering and the Financing of Terrorism Act; Law 24,240, the National Defense of Consumers Act, and Law 26,831 (**Exhibit 18**, Law 26,831), the Capital Markets Act, among others.

---

[65] Art. 31, BPBA Charter.

[66] Art. 33, BPBA Charter.

[67] Art. 87, BPBA Charter.

61. The Supreme Court has confirmed that these rules apply to BPBA. For example, it affirmed in a majority ruling penalties that the National Office of Domestic Trade had applied to BPBA: one, for violation of articles 4 and 19 of Law 24,240, the National Consumer Defense Act (based on a charge that had been applied without a contractual provision), and the other for a violation of art. 27 of Law 25,065 (**Exhibit 19**, Law 25,065), the National Credit Cards Act (because the procedure for questioning the settlement of a card was not complied with). In the part that concerns us here, the majority of the Supreme Court of the Argentine Republic confirmed that BPBA can be sanctioned just like any other bank, holding that *"what has been decided does not affect . . . the legal status of the local banking entity as an autarchic institution under public law, nor does it limit the exemptions it enjoys by virtue of the constitutional reservation, insofar as the privileges invoked are not related to the bank's behavior with respect to compliance with common law regulations"* such as laws on jurisdiction and credit cards *"and the violation of constitutional guarantees for consumers."*[68]

62. In the same line of argument, the National Court of Appeals for Federal Administrative Litigation confirmed that BPBA was covered and bound by the provisions of Law 22,802, in effect at that time (**Exhibit 21**, Law 22,802), the National Commercial Loyalty Act. In what concerns us here, the court held—with citations from other previous precedents—that BPBA could be sanctioned for violations of that law since *"the exemptions enjoyed by the banking entity, by virtue of the reservation made in the current article 121 of the National Constitution,*

---

[68] CSJN, "Bank of the Province of Buenos Aires v. National Office of Domestic Trade - Provision 622/05 [case 29.184/02]", 03/19/2014, Judgments: 337:205. (**Exhibit 20**, Judgments: 337:205.)

*are not affected*" by the imposition of the fine on the bank. Specifically, the fine "*does not threaten its legal status of constitutional roots, as an autarchic institution of public law (article one of Decree Law No. 9166/86 and National Supreme Court, in Judgments: 313:164).*"[69]

63. In another precedent, the National Court of Appeals in Federal Administrative Litigation also understood that BPBA—precisely because it was a financial institution—was subject to financial and exchange regulations just like any other entity of that nature. In this regard, the court affirmed the fine that had been applied to BPBA by the Central Bank of Argentina based on the violation of the duty to deliver coins to the public.[70]

64. In the same line of argument, the National Court of Appeals for Federal Administrative Litigation held that BPBA was subject to the federal regulation on the prevention of money laundering and financing of terrorism contained in Law 25,246, the Prevention and Control of Money Laundering and Financing of Terrorism Act, and its regulations and supplemental rules. In this regard, the court upheld Decision No. 55/20, by which the Financial Information Unit had imposed fines on BPBA and its directors pursuant to the provisions of art. 24, paragraphs 1 and 3, of Law 25,246, for failure to observe the regulations on the prevention of money laundering and financing of terrorism. On that occasion, the court confirmed that a self-administering institution of public law such as BPBA remains subject to the same regulations

---

[69] CNFed. CA., Chamber II, "Bank of the Province of Buenos Aires v. National Office of Domestic Trade - Prov. 548/10 (Case S01:86.248/08)", 03/22/2011, TR LA-LEY AR/JUR/17291/2011. (**Exhibit 22**, Case S01:86.248/08.)

[70] CNFed. CA., Chamber III, "Bank of the Province of Buenos Aires v. Central Bank of the Argentine Republic – Decision 206/08 (case 100488/08 SUM FIN 1241]," 06/08/2010. (**Exhibit 23**, Case. 100488/08 SUM FIN 1241.)

as other banks, finding that *"the actions of the national authority (in this case, the UIF), in compliance with a national regulation (law 25,246 and its regulations), do not contravene the reservation made by the Province of Buenos Aires. . . to legislate and govern its bank, nor do they affect the legal status of the banking entity as an autarchic institution of public law, nor do they limit the exemptions it enjoys."*[71]

## II.4. BPBA's commercial and financial activity is subject to the jurisdiction of the same courts as any other financial and banking entity

65. BPBA's autonomy as a financial and banking entity is also demonstrated by legal precedents subjecting its commercial and financial activity to the jurisdiction of the same courts as any other financial or banking entity.

66. Before we delve deeper into this point, it is worth recalling that under the federal system of government established in the Constitution[72], the Argentine Republic has both federal and provincial courts. The federal courts have jurisdiction in cases involving matters governed by the Constitution, by federal laws and by treaties concluded with foreign powers, as well as

---

[71] CNFed. CA., Chamber II, "Bank of the Province of Buenos Aires v. UIF re: Penal Code – Law 25,246 – Decree 290/07 Art 25" and "Helguero Marta Elena et al. v. UIF re: Penal Code – Law 25,246 – Decree 290/07 – Art. 25," 11/17/2021, Case 127/21. (**Exhibit 24**, Case 127/21.)

[72] Art. 1, National Constitution of Argentina. (**Exhibit 25**, Constitution of the Republic of Argentina.)

over disputes arising between provinces or between a province and the federal state.[73] In turn, the provincial courts and the local courts of the Autonomous City of Buenos Aires exercise jurisdiction over those matters not reserved for the federal courts, and they rule on disputes governed by local law.[74] It is thus the case that each province and the Autonomous City of Buenos Aires organize their own judiciaries, whose courts are independent from the federal judicial system.

67. In turn, the organization of the judicial system within each of these jurisdictions—federal and provincial—is made up of courts specializing in different areas, such as civil, commercial, administrative litigation, criminal, and labor law. In what concerns us here, the civil and commercial courts deal with disputes governed by private law, such as those arising from contracts entered into between private persons, liability, in rem rights, and corporate matters. On the other hand, the jurisdiction of the administrative litigation courts concerns litigation related mainly to public administrative law, such as, for example, those in which the validity, interpretation, and application of administrative acts, regulations and decisions of the public administration are disputed; those related to claims for damages arising from the acts or omissions of the State in the exercise of public functions, and so on. In summary, the fundamental difference lies in the applicable legal framework: while civil and commercial jurisdiction involves issues related to the rules of private law, administrative litigation

---

[73] Art. 116, National Constitution of Argentina. (**Exhibit 25**, National Constitution of Argentina.)

[74] Arts. 5 and 121, National Constitution of Argentina. (**Exhibit 25**, National Constitution of Argentina.)

jurisdiction, on the other hand, focuses on cases governed mainly by the rules of public administrative law.

68. However, in those cases where individuals sue BPBA for the performance of commercial contracts previously entered into—for example, for a checking account, savings account, bank loan with or without guarantee, etc.—the jurisdiction of the ordinary courts in commercial or civil matters has been recognized, as would be the case if the claim were directed against any other bank or entity in the Argentine financial system.

69. For example, the courts understood that a case filed by a customer against BPBA seeking compensation—prompted by the rejection of a check due to insufficient funds—must be processed in the courts with jurisdiction over commercial matters. To this end, the Court held, in what interests us here, that *"underlying the facts described in the lawsuit is the eminently commercial contractual relationship that linked the parties, referring to the operation of a bank current account, and in this sense it is pertinent, then, as the prosecutor of the Chamber pointed out in his opinion, to submit this trial, which deals with questions of a commercial nature, to procedures appropriate to the nature of these matters and to the courts specialized in the matter."*[75]

70. In the same line of argument, in those other cases where BPBA brings a legal action against its private debtors on the basis of common law rules, BPBA files an action before the courts with ordinary commercial or civil jurisdiction, as do all banks and entities in the Argentine

---

[75] CNCiv, Chamber A, "Méndez, Horacio A. v. Bank of the Province of Buenos Aires," LA LEY [The Law] 1999-C, p. 43 and DJ 2000-1, p. 426. (**Exhibit 26**, AR/JUR/212/1998.)

financial system in identical cases. It was thus, for example, that the National Chamber of Appeals in Commercial Matters heard enforcement proceedings brought by BPBA against a user, for the collection of a sum of money derived from a loan contract granted through the Acquisitive Value Unit system.[76]

71. In the same line of argument, BPBA filed suit in the courts with Civil and Commercial jurisdiction of La Plata against a customer to enforce collection of certain sums of money for debts arising from Visa and MasterCard credit cards and the debit balance on the checking account.[77]

72. Finally, it should be noted that in those exceptional cases where BPBA was sued before the federal courts of the Argentine Republic, this was due not to the fact that it was BPBA who was sued, but to the fact that the case involved federal issues. In one case, the Supreme Court of the Argentine Republic ruled that where a BPBA customer challenged the constitutionality of federal regulations, such as Decree 36/90 and Law 23,697, through which the reimbursement of fixed-term deposits in BONEX had been ordered, the case should be heard by the federal courts.[78] In that same line of argument, the Supreme Court of the Province of

---

[76] CNCom., Chamber C, "Bank of the Province of Buenos Aires v. Rojas, Marcelo Alejandro re: executive," 12/17/2024, AR/JUR/198568/2024. (**Exhibit 27**, AR/JUR/198568/2024.)

[77] CA. Civ. and Com. La Plata, Chamber II, "Bank of the Province of Buenos Aires v. Laborda, Walter Gastón re: summary collection of sums of money," 05/09/2024, AR/JUR/62182/2024. (**Exhibit 28**, AR/JUR/62182/2024.)

[78] CSJN, "Uriarte, Fernando Carlos v. Bank of the Province of Buenos Aires," 06/04/1991, Judgments: 314:508. (**Exhibit 18**, Judgments: 314:508.)

Buenos Aires held that the reason why an "amparo" action filed against BPBA to enforce compliance with BCRA Communication 3398—and arguing that, therefore, it should be forced to receive certain bonds as a cancellation payment—should be processed by the federal courts was because the case concerned compliance with the federal regulations of the Central Bank of Argentina.[79]

## II.5. The legal treatment given by the law and the courts to employees of BPBA is consistent with its autonomous nature

73. Finally, the Plaintiffs in this case are not correct in arguing that BPBA and the Province are *alter egos* because "Argentine courts treat Banco Provincia employees as public employees or public officers" and because "the Province's administrative court for public employees has jurisdiction over disputes between Banco Provincia and its employees" (Complaint ¶¶ 66–67.) As we will see below, BPBA's autonomy and its resulting separateness from the Province of Buenos Aires is consistent with the fact that some aspects of its work—in the present case, the relationship with its employees—are governed by public law and therefore subject to the jurisdiction of the administrative litigation courts.

---

[79] SCBA, "Álvarez, Oscar et al. v. Bank of the Province of Buenos Aires," 03/24/2004, La Ley Online [Online Law] [TR LALEY AR/JUR/1317/2004] (**Exhibit 29**, AR/JUR/1317/2004); *see also*, "Audine, María Beatriz v. Bank of the Province of Buenos Aires," 03/24/2004, La Ley Online [LALEY AR/JUR/1300/2004] (**Exhibit 30**, AR/JUR/1300/2004); among many others.

**a) Application of public law, although different from that applicable to employees of the Province of Buenos Aires.**

74. Among the consequences of the distinction between public law and private law, in continental European countries, a distinction is usually made between persons governed by private law and persons governed by public law. In this sense, Art. 145 of the Civil and Commercial Code of the Argentine Republic establishes that legal entities may be public or private. (**Exhibit 31**, Civil and Commercial Code of the Argentine Republic.)

75. The *public law persons* listed in the Civil and Commercial Code of the Argentine Republic include the national government, the provinces, the Autonomous City of Buenos Aires, the municipality, and—in what concerns us here—the self-governing entities and other organizations established in the Argentine Republic to which the legal system assigns this nature.[80] In short, what characterizes persons governed by public law is the fact that they are governed, with respect to their recognition, beginnings, capacity, operation, organization and purpose, by the laws and rules of public law—more specifically, those of their establishment[81]—without prejudice to the law applicable to the legal relationships they enter into.

76. Art. 1 of BPBA's Charter provides that *"Banco de la Provincia de Buenos Aires, as a State-owned Bank, is a self-administered public entity."* In light of the foregoing, this merely implies that matters relating to the recognition, beginnings, capacity, operation, organization and

---

[80] Art. 146, Civil and Commercial Code of the Argentine Republic: (**Exhibit 31**, Civil and Commercial Code of the Argentine Republic.)

[81] Art. 147, Civil and Commercial Code of the Argentine Republic. (**Exhibit 31**, Civil and Commercial Code of the Argentine Republic.)

purpose of BPBA's existence will be governed by public law. But, as the Supreme Court of the Argentine Republic has stated—and as is argued above—this *"bear[s] no relation to the bank's behavior with regard to compliance with common law and the violation of the constitutional rights of user and consumers."*[82]

77. The relationship between BPBA and its own employees is also governed by public law: more specifically, by the Bylaws for BPBA Employees and by the BPBA Employee Discipline Rules, both of which were approved by BPBA's Board of Directors in exercise of the powers conferred by Art. 24, paragraph i) of BPBA's Charter.

78. The application of these and other rules of public law to BPBA does not imply that it constitutes an *alter ego* of the Province of Buenos Aires. Rather, in accordance with the provisions of Section 147 of the Civil and Commercial Code of the Argentine Republic (**Exhibit 31**, Civil and Commercial Code of the Argentine Republic), the application of public law rules to BPBA reflects its nature as a *"self-administered public entity"* that it has been granted by art. 1 of BPBA's Charter.

79. This last point is confirmed by the fact that the public law rules applicable to the Province of Buenos Aires and BPBA are not the same, and instead different regulations apply to each. For example, continuing with the rules governing the relationship of public employment, while the labor relationship between the Province of Buenos Aires and its employees is governed by

---

[82] CSJN, "Bank of the Province of Buenos Aires v. National Office of Domestic Trade - Provision 622/05 [case 29.184/02]", 03/19/2014, Judgments: 337:205. (**Exhibit 20**, Judgments: 337:205.)

Law 10,430 (**Exhibit 32**, Law 10,430), the Provincial Public Employment Act—with these workers being subject to the Collective Bargaining Agreement and contributing to the Provincial Social Security Institute (IPS)— the legal relationship that exists between BPBA and its employees, in contrast, is governed by the Bylaws for BPBA Employees and by the BPBA Employee Discipline Rules, both of which are approved by BPBA's Board of Directors in the exercise of the powers conferred by art. 24, paragraph i), of BPBA's Charter. In turn, BPBA employees—as bank employees—are subject to Collective Bargaining Agreement 18/75 and contribute to the BPBA Retirement Fund.

80. In summary, while it is true that the BPBA is subject to certain public law rules, this reflects its nature as a *"self-administered public entity"* which is assigned to it in art. 1 of BPBA's Charter and not, in contrast, to the assertion that it constitutes an *alter ego* or a mere body of the Province of Buenos Aires. Thus, as has been pointed out, the rules of public law applicable to the former and the latter are different.

**b) Subsequent jurisdiction of the administrative litigation courts**

81. In the countries of the continental European system, the legal framework applicable to a given case usually determines, among other things, the subject-matter jurisdiction of the court that will intervene in it. In this sense, it has been said that *"the jurisdiction of the federal*

*administrative litigation judge . . . is limited by the application of the rules of public law (Administrative Law). . ."*[83].

82. According to this criterion, art. 1 of the Administrative Litigation Code of the Province of Buenos Aires, promulgated by Law 12,008 (t.o. Law 13,101), establishes that "*[a]dministrative courts shall hear and decide on claims asserted in cases arising from acts or omissions, in exercising administrative functions, of the bodies of the Province, the Municipalities, decentralized entities, and other persons, pursuant to the provisions of this Code.*"[84] For this purpose, the next line adds that "*[t]he acts of the bodies of the Executive Branch, the Municipalities, and other provincial or municipal entities are presumed to have been performed while in the exercise of administrative functions and to be governed by administrative law.*"[85]

83. As a consequence of the foregoing and the provisions of the above rules, the provincial courts with jurisdiction in administrative litigation are the ones that must hear legal cases brought by or against BPBA where public law is applicable; these include, for example, those arising within the framework of a public employment relationship.

84. However, the aforementioned circumstance—that is, that the causes of action arising between BPBA and its employees are heard by the courts of the Province of Buenos Aires with jurisdiction in administrative litigation—does not mean that BPBA is an *alter ego* or a mere

---

[83] BALBÍN, Carlos F., Curso de Derecho Administrativo [Course on Administrative Law], La Ley [The Law], Buenos Aires, 2008, Volume II, p. 743–744. (**Exhibit 33**, Balbín, 2008.)

[84] Art. 1, Administrative Litigation Code of the Province of Buenos Aires. (**Exhibit 34**, Law 12,008.)

[85] Art. 2, Administrative Litigation Code of the Province of Buenos Aires. (**Exhibit 34**, Law 12,008.)

body of the Province of Buenos Aires. Rather, this jurisdiction in administrative litigation derives from the mere fact that the employment relationship between BPBA and its employees is also governed by public law.

85. Furthermore, a review of provincial case law shows that the treatment given by the local administrative courts to cases brought against BPBA differs openly from that given to those brought against the Province of Buenos Aires to the extent that they take care to distinguish the different regulatory framework applicable to the legal relations arising in each case.

86. For example, in a precedent issued in the context of a public employment case against BPBA, the Supreme Court of the Province of Buenos Aires held that *"the complaint falls under contentious administrative jurisdiction"* because it concerned an employee of the Bank of the Province of Buenos Aires.[86]

87. In summary, without prejudice to what is stated in Section I—as regards BPBA's autonomy as enshrined in Art. 8 of BPBA's Charter and guaranteed throughout its articles—BPBA's autonomy and its consequent separation from the Province of Buenos Aires can also be seen in the case law of the courts of the Argentine Republic.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

---

[86] SCBA, "García, José v. Bank of the Province of Buenos Aires re: Dismissal," 09/05/2012, cause L 107398, which is available at https://juba.scba.gov.ar/VerTextoCompleto.aspx?idFallo=69980. (**Exhibit 35**, Judgment: 69980.)

Signed in Buenos Aires, Argentina, on February 28, 2025.

                                          _____

                                          Juan Antonio Stupenengo

TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS
DISTRITO DEL SUR DE NUEVA YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

GLACIAL CAPITAL, LLC y TRSE       :
HOLDINGS LLC,                    :
                                   :

           Demandantes,     :
                                   :

           c.                :   Caso Nº 24-cv-8156
                                   :

BANCO DE LA PROVINCIA DE      :
BUENOS AIRES,                  :
                                   :

           Demandado.      :
                                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

## **DECLARACIÓN DE EXPERTO DE JUAN ANTONIO STUPENENGO**

De acuerdo al 28 U.S.C. § 1746 y la Regla 44.1 de las Reglas Federales de los Procedimientos

Civiles, yo, Juan Antonio Stupenengo, declaro lo siguiente:

1.  Presento esta declaración de experto en respaldo de la moción de desestimación interpuesta

    por el Banco de la Provincia de Buenos Aires.

2.  Soy abogado debidamente licenciado y habilitado en la República Argentina.

3.  Soy abogado, recibido con honores, de la Facultad de Derecho de la Universidad de Buenos

    Aires (**"UBA"**). Soy Especialista en Derecho Administrativo y Administración Pública,

    también por la UBA. En lo académico, soy profesor regular adjunto, designado por concurso,

    de la materia "Elementos de Derecho Administrativo", correspondiente a la carrera de abogacía

    de la Facultad de Derecho de la UBA, y, también, de las materias "Instituciones del Derecho

    Administrativo" y "Fundamentos del Derecho Administrativo", de la carrera de abogacía de la

    Facultad de Ciencias Jurídicas de la Pontificia Universidad Católica Argentina. En el ámbito

de posgrado, soy profesor titular de materias vinculadas con derecho administrativo —entre ellas, algunas referidas a la organización estatal y administrativa— en los posgrados en derecho administrativo de la Universidad Nacional de La Plata, de la Universidad Nacional de La Matanza, de la Universidad Nacional de Tucumán, de la Universidad Nacional de la Patagonia "San Juan Bosco" y, en el ámbito académico privado, de la Pontificia Universidad Católica Argentina, de la Universidad Austral y de la Universidad de Belgrano. Asimismo, soy profesor de las carreras de posgrado de la Escuela del Cuerpo de Abogados del Estado de la Procuración del Tesoro de la República Argentina y de la Escuela de Formación de Abogacía Pública de la Procuración General de la Ciudad Autónoma de Buenos Aires.

4. Soy vicepresidente de la Asociación de Derecho Administrativo de la Ciudad Autónoma de Buenos Aires e integrante de la Asociación Iberoamericana de Regulación. Soy autor del libro "Ejecución judicial del acto administrativo" (Astrea, 2017), coordinador y coautor de la obra colectiva "Temas de Derecho Administrativo Sancionador" (Editorial Platense, 2024) y autor de numerosos artículos y notas vinculados también al derecho administrativo. Soy conferencista nacional e internacional, habiendo disertado sobre temas relacionados al derecho administrativo —y, en muchos casos, a la organización estatal y administrativa— tanto en la República Argentina como en el extranjero.

5. Desde hace más de diez años vengo siendo distinguido entre los abogados especializados en derecho público más destacados de América Latina por las publicaciones *Chambers & Partners*, *Best Lawyers* y *Legal 500*. En lo profesional, tras haberme desempeñado por más de diez años como funcionario en los tribunales de la República Argentina —más precisamente, en el fuero Contencioso Administrativo Federal y en el Contencioso Administrativo y Tributario de la Ciudad Autónoma de Buenos Aires— actualmente me desempeño como socio

del Estudio Beccar Varela, sito en la Ciudad Autónoma de Buenos Aires, donde codirijo el Departamento de Derecho Administrativo.

6. Mi *currículum vitae* se adjunta como el Anexo 1 de esta declaración (**Anexo 1**, CV).

## RESUMEN EJECUTIVO

7. En el acápite I de esta declaración explico que, según lo dispuesto en su Carta Orgánica, el Banco de la Provincia de Buenos Aires es una entidad autárquica y autónoma.

8. En el acápite II de esta declaración explico que la jurisprudencia de los tribunales de la República Argentina ha reconocido la naturaleza autónoma del Banco de la Provincia de Buenos Aires.

## I.    NATURALEZA JURÍDICA DEL BANCO DE LA PROVINCIA DE BUENOS AIRES: ENTIDAD AUTÁRQUICA Y AUTÓNOMA

9. Para analizar la naturaleza jurídica del Banco de la Provincia de Buenos Aires ("**BPBA**"), debe partirse del Dec.-Ley 9434/79 de la Provincia de Buenos Aires, por medio del cual fue aprobada la Carta Orgánica del BPBA ("**la Carta Orgánica del BPBA**"), la cual —a su vez— ha sido sucesivamente reformada por diversas leyes de la Legislatura de la Provincia de Buenos Aires; entre ellas, las leyes 10.534, 10.766, 12.354, 12.695, 12.726, 13.072, 13.174, 13.786, 13.929, 14.062, 14.199, 14.331, 14.396, 14.552, 14.879. 15.225, 15.310, 15.394 y 15.480.

10. De acuerdo con lo dispuesto en la Carta Orgánica del BPBA, *"[e]l Banco de la Provincia de Buenos Aires es una institución autárquica de derecho público, en su carácter de Banco de Estado, con el origen, garantías y privilegios declarados en el preámbulo y en los artículos 31 y 104 de la Constitución Nacional, en la Ley Nacional de origen contractual número 1029 y*

-3-

*en las Leyes de la Provincia*"[1]. La Carta Orgánica deja claro que esto significa que el BPBA es completamente autónomo, gobernado exclusivamente por su Directorio: *"[e]n concordancia con lo dispuesto en el artículo 1 la Provincia acuerda al Banco completa autonomía, quedando el gobierno de éste a cargo exclusivo del Directorio"*[2].

11. De manera que en la Carta Orgánica del BPBA se reconoce a favor del BPBA **(I.1)** por un lado, su carácter de institución autárquica de derecho público y **(I.2)** por otro lado, su carácter de institución autónoma.

## I.1. El BPBA como institución autárquica de derecho público

12. Como se adelantó, en el art. 1 de la Carta Orgánica del BPBA se dispone que *"[e]l Banco de la Provincia de Buenos Aires es institución autárquica de derecho público"*.

13. De acuerdo con las reglas de la organización administrativa, la autarquía es una de las tantas formas de descentralización administrativa, lo que implica —a su vez— el reconocimiento de personalidad jurídica propia a favor del ente autárquico. Dicha personalidad jurídica propia le permite al ente autárquico —en el caso, al BPBA— actuar en el ámbito jurídico como un sujeto distinto de la Provincia de Buenos Aires. En este sentido, el reconocido autor Juan Carlos Cassagne ha dicho que *"si la descentralización consiste en la asignación de funciones estatales a entidades con personalidad jurídica propia, separadas de la Administración central . . . toda*

---

[1] Art. 1, Carta Orgánica del BPBA.

[2] Art. 8, Carta Orgánica del BPBA.

*descentralización de naturaleza administrativa lleva ínsita la autarquía o facultad de autoadministrarse"*[3].

14. Autores reconocidos del derecho argentino entienden que *" 'autarquía' significa que un ente determinado tiene capacidad para* administrarse a sí mismo"[4] y que "*la entidad autónoma . . . es capaz de darse su propio estatuto quedando éste sujeto, por supuesto, a lo que disponga la ley de creación respecto a la aprobación por el órgano central"*[5].

15. De acuerdo con el sistema de derecho argentino, las personas jurídicas se crean y se rigen por el derecho público o el derecho privado. De acuerdo con lo dispuesto en el art. 147 del Código Civil y Comercial de la República Argentina, el hecho de que el BPBA sea una *"institución autárquica de derecho público"*[6] implica solamente que los principales aspectos de su existencia y actividad —o sea, su reconocimiento, comienzo, capacidad, funcionamiento, organización y fin de su existencia— se encuentran regidos por leyes y ordenamientos de derecho público en lugar de derecho privado (como sería una compañía privada). Esto es así sin perjuicio de que las normas de derecho privado u otras resulten aplicables a las relaciones jurídicas que el BPBA entable. Por lo tanto, en tanto la Carta Orgánica del BPBA reconoce al BPBA su carácter de institución autárquica de derecho público, ello implica la existencia de una persona jurídica diferenciada de la Provincia de Buenos Aires —con competencias

---

[3] CASSAGNE, Juan Carlos, Curso de Derecho Administrativo, Thomson Reuters – La Ley, Buenos Aires, 13ª edición actualizada y ampliada, Tomo I, p. 266. (**Anexo 2**, Cassagne.)

[4] GORDILLO, Agustín, Tratado de Derecho Administrativo, Ed. Fundación de Derecho Administrativo, Buenos Aires, Tomo 1, p. XIV-12. (**Anexo 3**, Gordillo.)

[5] DIEZ, Manuel María, Manual de Derecho Administrativo, Editorial Plus Ultra, Buenos Aires, Tomo 1, p. 146. (**Anexo 4**, Diez.)

[6] Art. 1, Dec.-Ley 9434/79. (**Anexo 5**, Decreto 9434/79.)

distintas a las reconocidas constitucional y legalmente a los órganos provinciales—, lo que impide que una y otra puedan ser condenados por las acciones del otro.

16. La personalidad jurídica diferenciada del BPBA (como ente autárquico) y de la Provincia de Buenos Aires conduce también a que uno no pueda ser condenada por el accionar o las omisiones del otro. En un caso, la Corte Suprema de Justicia ("CSJN") sostuvo que el Estado Federal no podía ser válidamente condenado por los hechos de la Dirección Nacional de Vialidad, uno de sus entes autárquicos. Según la Corte, la Dirección Nacional de Vialidad *"fue constituida como 'una entidad autárquica de derecho público, con personalidad para actuar privada y públicamente' (art. 1° del decreto-ley 505/58)"*[7]. En consecuencia, la Corte concluyó que, al condenar al Estado Federal por los actos de la Dirección Nacional de Vialidad, la corte inferior había "*pasa[do] por alto la existencia de una persona jurídica diferenciada cuyas competencias no le resultaban imputables en forma directa"* al Estado Federal.[8]

**I.2. El BPBA como institución autónoma de la Provincia de Buenos Aires**

17. En el art. 8 de la Carta Orgánica del BPBA también se dispone que *"[e]n concordancia con lo dispuesto en el artículo 1 la Provincia acuerda al Banco completa autonomía, quedando el gobierno de éste a cargo exclusivo del Directorio"*.

---

[7] CSJN, "Ceballos, Estefanía Itatí y otro c/ Dirección Nacional de Vialidad y otros s/ daños y perjuicios", 20/09/2022, Fallos: 345:1025. (**Anexo 6**, Fallos: 345:1025.)

[8] CSJN, "Ceballos, Estefanía Itatí y otro c/ Dirección Nacional de Vialidad y otros s/ daños y perjuicios", 20/09/2022, Fallos: 345:1025. (**Anexo 6**, Fallos: 345:1025.)

18. Bajo el derecho argentino, *"la autonomía constituye una forma superior de descentralización política"*[9]. Según un reconocido jurista argentino, "*la 'autonomía' agregaría a la característica anterior*" —o sea, a la autarquía— "*la capacidad para* dictarse sus propias normas, *dentro del marco normativo general dado por un ente superior"*[10]. La razón de ello es que una entidad autónoma goza de "*la facultad de darse sus propias normas fundamentales e implica una potestad normativa originaria"*[11]. Un reconocido autor argentino explica que, "[*c*]*uando se dice que la* autonomía *implica* darse sus propias normas dentro de un marco normativo superior*, se abarca no sólo a las provincias sino también a los entes autárquicos, pues éstos, dentro del marco de sus estatutos, también se dictan sus propias normas*" —dicho de otra manera— *[l]a autarquía no puede concebirse como mera capacidad de administrarse, sin poder dictarse norma alguna, sino que comprende siempre el dictado de normas para reglar el propio funcionamiento"*[12].

19. Ahora bien, admitido que un ente tiene capacidad de darse sus propias normas, el jurista argentino BALBÍN[13] explica que el análisis del grado de autonomía de los entes debe ser realizado a la luz de cuatro pautas; a saber, **(a)** el procedimiento de designación de sus

---

[9] CASSAGNE, Juan Carlos, op. cit., Tomo I, p. 266. (**Anexo 2**, Cassagne.)

[10] GORDILLO, Agustín, op. cit., p. XIV-12. (**Anexo 3**, Gordillo.)

[11] CASSAGNE, Juan Carlos, op. cit., Tomo I, p. 266. (**Anexo 2**, Cassagne.) *Ver también* DIEZ, Manuel María, op. cit., p. 146 ("*la entidad autónoma se da sus propias normas y se rige por ellas.*"). (**Anexo 4**, Diez.)

[12] GORDILLO, Agustín, op. cit., p. XIV-12. (**Anexo 3**, Gordillo.)

[13] BALBÍN, Carlos F., Tratado de Derecho Administrativo, Thomson Reuters – La Ley, Buenos Aires, 2015, 2º edición actualizada y ampliada, Tomo II, p. 172–173. (**Anexo 7**, Balbín, 2015.)

miembros, (**b**) el control de los poderes políticos sobre el ente; (**c**); el régimen de financiamiento; y, por último, (**d**) la capacidad de autogestión y dirección de su personal.

20. A continuación, veremos que en el caso del BPBA el análisis de los puntos mencionados permite concluir que, en línea con lo dispuesto en el art. 8 de la Carta Orgánica del BPBA, el BPBA constituye un auténtico ente autónomo que, como tal, no puede ser considerado un *alter ego* de la Provincia de Buenos Aires.

**a)  La forma de designación del Presidente y los vocales del BPBA**

21. La primera pauta en el análisis de la autonomía es el procedimiento de designación de los miembros del ente. El jurista BALBÍN explica que *"[l]os miembros de los entes autónomos deben ser designados mediante procedimientos que garanticen debidamente su capacidad e idoneidad pero, particularmente, su independencia de criterio".* Agrega que hay "*distintos modos*" de designación que pueden garantizar la capacidad e idoneidad de los directores, como "*el nombramiento por el propio Ejecutivo; el nombramiento del Ejecutivo con acuerdo del Senado; el proceso de selección mediante concurso público; las elecciones por voto de los integrantes del sector; o el nombramiento por el Presidente a propuesta de un sector determinado, entre tantos otros"*[14].

22. Ahora bien, en lo que respecta a la designación de los integrantes del Directorio del BPBA —esto es, de su Presidente y de los restantes vocales—, se dispone en la Constitución de la Provincia de Buenos Aires y en la Carta Orgánica del BPBA que aquellos deben ser nombrados

---

[14] BALBÍN, Carlos F, op. cit., p. 173. (**Anexo 7**, Balbín, 2015.)

por el Gobernador de la Provincia de Buenos Aires con acuerdo del Senado[15]. A su turno, en la Carta Orgánica del BPBA se agrega que aquellos integrantes deben contar *"con antecedentes de reconocida idoneidad"*[16].

23. En lo que hace a la exigencia del acuerdo del Senado, tiene dicho la Corte Suprema de Justicia —aunque con referencia a idéntico recaudo exigido por la Constitución de la República Argentina para la designación de los jueces federales— que la exigencia de *"participación del Poder Ejecutivo Nacional y del Poder Legislativo, encierra la búsqueda de un imprescindible equilibrio político pues, tal como lo ha enfatizado muy calificada doctrina, el acuerdo del Senado constituye 'un excelente freno sobre el posible favoritismo presidencial…', pero también entraña el propósito de obtener las designaciones mejor logradas: 'el Senado — enseña Estrada— presta o no su acuerdo, según reconozca en la persona propuesta las cualidades y méritos requeridos para el fiel desempeño de las difíciles cuestiones que está llamado a resolver"*[17].

24. En suma, la exigencia del acuerdo del Senado para la designación del Presidente y los vocales del BPBA por parte del Gobernador de la Provincia de Buenos Aires constituye una garantía constitucional y legal de que dichas designaciones no habrán de recaer sobre personas que no reúnan las condiciones de imparcialidad, independencia e idoneidad necesarias para el ejercicio de los importantes y altos cargos de que se trata. Como se mencionó más arriba, ello

---

[15] Art. 18, Dec.-Ley 9434/79. (**Anexo 5**, Decreto 9434/79.)

[16] Art. 18, Carta Orgánica del BPBA.

[17] CSJN, "Aparicio, Ana Beatriz y otros c/ Estado Nacional – Corte Suprema de Justicia de la Nación - Consejo de la Magistratura - art. 110 s/ empleo público", 21/04/2015, Fallos: 338:284. (**Anexo 8**, Fallos: 338:284.)

refuerza la autonomía que se consagra a favor del BPBA en el art. 8 de la Carta Orgánica del BPBA.

**b) El control de los poderes políticos sobre el ente**

25. La segunda pauta en el análisis de la autonomía es el control de los poderes políticos sobre el ente. Sobre este punto, enseña BALBÍN que *"[l]os entes autónomos deben ser controlados, al igual que cualquier otro ente estatal, por el órgano de fiscalización externo del Estado (AGN)"*[18]. En tales casos, "*el control del Ejecutivo es mínimo ya que no existe poder jerárquico entre el Presidente y el ente*"[19]. Al no existir una relación de jerarquía entre el jefe del ejecutivo y el ente, "*el Ejecutivo no ejerce potestades de mando y, consecuentemente, no puede, entre tantas otras cosas, darle órdenes, avocarse sobre los asuntos del ente o resolver recursos. Tampoco existe control tutelar (es decir, el poder de intervenirlos)*"[20].

26. Veremos que lo dicho en el párrafo transcripto —para explicar la forma y el grado de control que deben tener los entes autónomos para poder ser considerados verdaderamente como tales— , se verifica, sin lugar a duda, respecto del BPBA.

27. El art. 159 de la Constitución de la Provincia de Buenos Aires establece que es competencia del Tribunal de Cuentas de la Provincia de Buenos Aires —órgano de contralor externo creado y ubicado constitucionalmente en el ámbito de la Legislatura de la Provincia, no del poder ejecutivo—, *"[i]nspeccionar las oficinas provinciales o municipales que administren fondos públicos y tomar las medidas necesarias para prevenir cualquier irregularidad en la forma y*

---

[18] BALBÍN, Carlos F., op. cit., p. 173. (**Anexo 7**, Balbín, 2015.)

[19] BALBÍN, Carlos F., op. cit., p. 173. (**Anexo 7**, Balbín, 2015.)

[20] BALBÍN, Carlos F., op. cit., p. 173. (**Anexo 7**, Balbín, 2015.)

*con arreglo al procedimiento que determine la ley"*[21]. En este sentido, el BPBA está sujeto al control externo del Tribunal de Cuentas, lo cual es solamente un control de auditoria para asegurar que los fondos de la Provincia que están en custodia del BPBA en su rol de agente financiero no sean mal utilizados.

28. Por otro lado, precisamente por la naturaleza del BPBA —que, como venimos viendo, constituye un ente autárquico y autónomo— las decisiones del Directorio del BPBA no pueden ser revisadas jerárquicamente por el Gobernador de la Provincia de Buenos Aires ni por ninguno de los ministros ni órganos inferiores de la administración provincial centralizada. Además, el Gobernador de la Provincia de Buenos Aires y los ministros no tienen poder de mando sobre el Directorio del BPBA. Antes bien, como se establece en el ya citado art. 8 de la Carta Orgánica del BPBA, "*la Provincia acuerda al Banco completa autonomía, quedando el gobierno de éste a cargo exclusivo del Directorio"*.

**c)  El régimen de financiamiento**

29. La tercera pauta en el análisis de la autonomía es el régimen de financiamiento del ente. Para ser considerado un ente autónomo, el régimen de financiamiento del ente debe estar "*compuesto por recursos del Tesoro y otros de carácter propio"*[22].

30. No hay duda de que el BPBA cuenta con sus propias fuentes de financiamiento aparte de los fondos recibidos de la Provincia de Buenos Aires. Surge de la Carta Orgánica del BPBA que el BPBA tiene recursos provenientes de su propia actividad comercial bancaria y financiera,

---

[21] Art. 159, inc. 2, Constitución de la Provincia de Buenos Aires. (**Anexo 9**, Constitución de la Provincia.)

[22] BALBÍN, Carlos F., op. cit., p. 174. (**Anexo 7**, Balbín, 2015.)

como son, por ejemplo, los préstamos e intereses generados por operaciones financieras, las comisiones provenientes de los servicios prestados, los recursos provenientes de inversiones, las colocaciones y la renta de bienes propios.

31. El BPBA también puede recibir fondos de la Provincia de Buenos Aires provenientes de la Ley de Presupuesto, proyectada por el propio BPBA. La Carta Orgánica del BPBA dispone que el BPBA se encuentra sujeto a las disposiciones de la Ley de Contabilidad en lo que hace a la ejecución de su presupuesto anual[23]. Así surge, asimismo, del Dec.-Ley 7764/71, de Contabilidad de la Provincia de Buenos Aires, en el que se establece que *"[l]a presente ley regirá los actos u operaciones de los que se deriven transformaciones o variaciones en la Hacienda Pública quedando comprendidas en la misma los órganos administrativos centralizados y descentralizados del Estado"[24].*

32. Como lo dispone la Carta Orgánica del BPBA, el proyecto de presupuesto del BPBA debe ser confeccionado por el propio Directorio del BPBA y elevado luego a la Gobernación de la Provincia[25] para que éste, luego —antes del 31 de agosto de cada año—, eleve el proyecto de Ley de Presupuesto a la Legislatura de la Provincia de Buenos Aires, que tiene el poder de aprobar ese proyecto de presupuesto, pero no de modificarlo[26]. Además, este presupuesto solo incluye gastos para el personal, compras de bienes y servicios del BPBA. No incluye gastos

---

[23] Art. 12, Carta Orgánica del BPBA.

[24] Art. 1, Dec.-Ley 7764/71, de Contabilidad de la Provincia de Buenos Aires. (**Anexo 10**, Decreto 7764/71.)

[25] Art. 24, Carta Orgánica del BPBA.

[26] Art. 5, Dec.-Ley 7764/71, de Contabilidad de la Provincia de Buenos Aires. (**Anexo 10**, Decreto 7764/71.)

para su actividad comercial. Estos gastos están incluidos en otro presupuesto que no está sujeto

a la aprobación de la Legislatura.

33. Si bien la aplicación del Dec.-Ley 7764/71 de Contabilidad, al BPBA implica que una parte de

su financiamiento puede provenir de los recursos públicos de la Provincia de Buenos Aires,

cabe remarcar que, en los hechos, aquella asignación presupuestaria a favor del BPBA no

siempre tiene lugar. Del análisis de los presupuestos anuales aprobados por la Legislatura de

la Provincia de Buenos Aires para los años 2021 a 2023 (que se prorrogó durante 2024), se

advierte que en ellos no ha sido asignado fondo alguno a favor del BPBA. Sin duda ello

también da cuenta de la clara separación existente entre la Provincia de Buenos Aires y el

BPBA.

34. Ahora bien, lo señalado hasta aquí acerca del financiamiento presupuestario del BPBA

tampoco implica que la Provincia de Buenos Aires se encuentre habilitada a echar mano

discrecionalmente a dichos fondos. Antes bien, la propia Constitución de la Provincia de

Buenos Aires dispone de modo claro y expreso que *"[l]a Legislatura no podrá disponer de*

*suma alguna del capital del Banco de la Provincia"*[27]. Un jurista explica que "*[c]omo capital*

*del Banco debe entenderse a la masa de valores con que el mismo cuenta para afrontar los*

*compromisos contraídos*"[28]. Si la propia Constitución de la Provincia de Buenos Aires prohíbe

a la Legislatura —órgano provincial de representación ciudadana— disponer de las sumas del

---

[27] Art. 50, Constitución de la Provincia de Buenos Aires. (**Anexo 11**, Constitución de la Provincia.)

[28] MORENO, Guillermo Raúl, Comentarios a la Constitución de la Provincia de Buenos Aires, concordada y con notas de jurisprudencia, Editorial Librería Platense, La Plata, 2019, p. 304. (**Anexo 12**, Moreno.)

BPBA, con más razón dicha prohibición se extiende a la propia Gobernación de la Provincia de Buenos Aires.

**d) La capacidad de autogestión y dirección de su personal**

35. La cuarta pauta en el análisis de la autonomía es la capacidad de autogestión y dirección de su personal. Para poder ser considerados como tales, *"[l]os entes [autónomos] deben tener las potestades necesarias para gestionar y administrar sus recursos materiales y humanos. Es decir, no sólo fijar sus objetivos y planificar sus políticas sino, además, conducirse en ese sentido"*[29].

36. Como se mencionó más arriba, en lo que respecta a la gestión y dirección del BPBA se dispone en el art. 8 de la Carta Orgánica del BPBA que *"la Provincia acuerda al Banco completa autonomía, quedando el gobierno de éste a cargo exclusivo del Directorio"*.

37. Más allá de lo dispuesto en términos generales en el citado art. 8, del articulado de la Carta Orgánica del BPBA surge que el Directorio del BPBA tiene competencia para decidir —entre otras cosas—, las siguientes:

- la concesión de préstamos o adelantos a la Provincia de Buenos Aires con garantía y orden de venta de títulos de su deuda pública por un importe de hasta el 15% del presupuesto vigente de la Administración General[30];
- el otorgamiento a la Provincia de Buenos Aires de líneas de crédito para hacer frente a erogaciones de interés social para sus habitantes y/o a inversiones en infraestructura hasta el 20% del presupuesto vigente para la Administración General, contra la correspondiente garantía ofrecida por la Provincia de Buenos Aires[31];

---

[29] BALBÍN, Carlos F., op. cit., p. 174. (**Anexo 7**, Balbín, 2015.)

[30] Art. 11, Carta Orgánica del BPBA.

[31] Art. 11 bis, Carta Orgánica del BPBA.

- la determinación del capital del BPBA[32]; la designación del vicepresidente y del secretario[33];

- la venta de los inmuebles hipotecados[34];

- el otorgamiento de fianzas o garantías reales y el pago de los gastos y comisiones que sean necesarias para la emisión y para obtener la admisión de las obligaciones en los mercados y plazas del exterior[35].

38. Asimismo, de acuerdo con lo dispuesto en la Carta Orgánica del BPBA, son facultades y obligaciones exclusivas del Directorio del BPBA —sin que incida en su ejercicio el Gobernador de la Provincia de Buenos Aires ni ninguno de los ministros— las siguientes:

- acordar, establecer, autorizar y reglamentar todas las operaciones, servicios y gastos del BPBA[36];

- reglamentar los créditos que puedan acordarse[37];

- establecer los márgenes dentro de los cuales la Gerencia General, Gerencias Departamentales y Gerencias de Sucursales podrán acordar los créditos[38];

- convocar a sesión extraordinaria al Directorio del BPBA[39];

- designar el Gerente General, Subgerente General y Gerentes Departamentales a propuesta del Presidente[40];

- aprobar anualmente el Balance General, la Cuenta de Ganancias y Pérdidas, el plan de destino de las utilidades del Ejercicio y la Memoria[41];

---

[32] Art. 15, Carta Orgánica del BPBA.

[33] Art. 20, Carta Orgánica del BPBA.

[34] Art. 70, Carta Orgánica del BPBA.

[35] Art. 84, Carta Orgánica del BPBA.

[36] Art. 24, inc. b, Carta Orgánica del BPBA.

[37] Art. 24, inc. c, Carta Orgánica del BPBA.

[38] Art. 24, inc. d, Carta Orgánica del BPBA.

[39] Art. 24, inc. e, Carta Orgánica del BPBA.

[40] Art. 24, inc. f, Carta Orgánica del BPBA.

[41] Art. 24, inc. g, Carta Orgánica del BPBA.

- crear las reservas y fondos de previsión que juzgue convenientes para la consolidación de la situación financiera del BPBA[42];

- dictar los reglamentos internos[43];

- establecer filiales o representaciones en la República Argentina y en el extranjero[44];

- designar corresponsales en el interior de la República Argentina y en el extranjero, reglamentando sus relaciones con el BPBA[45];

- autorizar el otorgamiento de poderes generales y especiales fijando las facultades y atribuciones conferidas[46];

- proyectar el presupuesto anual de gastos del BPBA[47];

- remover al personal, previo sumario, y reglamentar las medidas disciplinarias respecto al mismo[48];

- reunirse en sesiones ordinarias y extraordinarias en cualquiera de las casas del BPBA y todas las veces que estime necesarias[49];

- ejercer las acciones judiciales con todas las facultades de ley sin limitación[50];

- acordar quitas, conceder esperas o concertar arreglos con los deudores de cualquiera de las secciones y aceptar o adquirir inmuebles u otros bienes o valores en pago o defensa de los créditos del BPBA[51];

- adquirir los inmuebles indispensables para el funcionamiento de las casas, filiales o dependencias del BPBA y enajenarlos cuando así convenga, como así también vender los bienes raíces, muebles u otros valores que el BPBA haya recibido en

---

[42] Art. 24, inc. h, Carta Orgánica del BPBA.

[43] Art. 24, inc. i, Carta Orgánica del BPBA.

[44] Art. 24, inc. j, Carta Orgánica del BPBA.

[45] Art. 24, inc. k, Carta Orgánica del BPBA.

[46] Art. 24, inc. l, Carta Orgánica del BPBA.

[47] Art. 24, inc. m, Carta Orgánica del BPBA.

[48] Art. 24, inc. n, Carta Orgánica del BPBA.

[49] Art. 24, inc. o, Carta Orgánica del BPBA.

[50] Art. 24, inc. p, Carta Orgánica del BPBA.

[51] Art. 24, inc. q, Carta Orgánica del BPBA.

pago o se le hayan adjudicado en defensa de sus créditos o que por otro título lo adquiriere[52];

- otorgar préstamos a personas jurídicas del sector privado[53];

- informar a las Comisiones de Presupuesto e Impuestos de la Cámara de Diputados y de la Cámara de Senadores sobre la evolución y situación de los deudores clasificados en situación irregular[54]; y

- supervisar el estricto cumplimiento por parte de las diferentes jerarquías del BPBA de las disposiciones de la Carta Orgánica y de las políticas, normas, manuales e instructivos que sobre la aprobación y recuperación de créditos apruebe el cuerpo, así como del adecuado diseño y eficaz aplicación de los sistemas de control interno sobre el particular[55].

39. Lo expuesto hasta aquí sobre la autogestión y autogobierno realizado por el propio BPBA, de la mano de su Directorio, no se ve socavado por el hecho de que *"[e]l Banco [sea] el agente financiero del Gobierno de la Provincia"*[56]. Antes bien, dicho carácter simplemente significa que la Provincia contrata a la BPBA, de manera onerosa, para realizar funciones que la Provincia decide no realizar directamente.

40. Primero, tras disponerse en la Carta Orgánica del BPBA que el BPBA realizará *"la percepción de las rentas e impuestos fiscales"*, se agrega que ello tendrá lugar *"con arreglo a lo dispuesto por convenio"* con la Provincia de Buenos Aires y que *"'[e]l Gobierno de la Provincia abonará al Banco en concepto de comisión por la recaudación de las rentas e impuestos fiscales el costo del servicio"*[57].

---

[52] Art. 24, inc. r, Carta Orgánica del BPBA.

[53] Art. 24, inc. s, Carta Orgánica del BPBA.

[54] Art. 24, inc. t, Carta Orgánica del BPBA.

[55] Art. 24, inc. u, Carta Orgánica del BPBA.

[56] Art. 9, Carta Orgánica del BPBA.

[57] Art. 9, inc. a, Carta Orgánica del BPBA.

41. En segundo lugar, la realización, por parte del BPBA, de *"servicios de la deuda pública de la Provincia ajustándose a las instrucciones que le imparta anualmente el Ministerio de Economía"*[58] tampoco desdibuja la autonomía del BPBA respecto de la Provincia de Buenos Aires. En este caso el BPBA actúa como un típico gestor administrativo en la realización de los servicios de la deuda, función que suele ser cumplida por los bancos públicos o privados para emisores soberanos sin que ello permita concluir que hay confusión entre uno y otro.

42. La separación entre la Provincia de Buenos Aires y el BPBA se confirma a poco que se repara en que los fondos utilizados para los servicios de la deuda no provienen del BPBA sino de las cuentas de la Provincia de Buenos Aires administradas por aquél. Ello surge claro de la Carta Orgánica del BPBA en cuanto allí se dispone que *"[p]ara cumplir esa misión, el Banco retendrá, de las sumas que perciba en concepto de impuestos, rentas fiscales o participaciones que correspondan a la Provincia en impuestos nacionales, los importes que según comunicaciones de dicho Ministerio insuma el pago de intereses, amortizaciones y otros gastos de los empréstitos que deban ser atendidos de acuerdo con las obligaciones y plazos establecidos en los contratos"*[59]. En otras palabras, de acuerdo con la norma transcripta, antes de transferirse los fondos a la Provincia de Buenos Aires, el BPBA debe retener

---

[58] Art. 9, inc. b, Carta Orgánica del BPBA.

[59] Art. 9, inc. b, Carta Orgánica del BPBA. Y si bien es cierto que en dicha norma también se establece que *"[c]uando el volumen de la recaudación no permita reunir las cantidades necesarias para la atención de los servicios, el Banco podrá adelantar los fondos indispensables"*, a renglón seguido se agrega —para reafirmar la separación entre el BPBA y la Provincia de Buenos Aires— que aquello será realizada *"reembolsándose de las sumas que ingresen posteriormente por los conceptos expresados en este inciso, de modo que los adelantos hechos para estos fines queden cancelados [al BPBA] el último día hábil de cada año"* (art. 9, inc. b).

automáticamente de los ingresos de la Provincia de Buenos Aires el dinero necesario para pagar su deuda; o sea, intereses, amortizaciones y otros gastos.

43. En suma, el carácter autónomo del BPBA y su consiguiente separación de la Provincia de Buenos Aires no solo surgen de la letra del art. 8 de la Carta Orgánica del BPBA sino, también, de la regulación contenida en esta última en torno a los aspectos básicos y fundamentales de dicha autonomía. Estos aspectos incluyen el procedimiento de designación del Presidente y los demás miembros del Directorio, la falta de control de los poderes políticos sobre el BPBA, el régimen de financiamiento del BPBA y su capacidad de autogestión y dirección.

## II. <u>LA NATURALEZA AUTÓNOMA DEL BANCO DE LA PROVINCIA DE BUENOS AIRES SEGÚN LA JURISPRUDENCIA DE LOS TRIBUNALES ARGENTINOS</u>

44. La autonomía del BPBA y su consiguiente separación respecto de la Provincia de Buenos Aires también puede verse reflejada en la jurisprudencia de los tribunales de la República Argentina. Más precisamente, ello se ve reflejado en una serie de precedentes judiciales de los que surge **(II.1)** el diverso tratamiento jurisprudencial dado, por un lado, a los casos en los que la parte en juicio es el BPBA y, por el otro, a aquellos otros en los que lo es la Provincia de Buenos Aires; **(II.2 )** que el tratamiento tributario y fiscal dado por la ley y los tribunales al BPBA no es contrario a su naturaleza autónoma; **(II.3)** la sujeción de la actividad comercial y financiera del BPBA a los mismos regímenes normativos que cualquier otra entidad financiera y bancaria; **(II.4)** la sujeción de la actividad comercial y financiera del BPBA a la competencia de los mismos tribunales que cualquier otra entidad financiera y bancaria; y **(II.5)** que el tratamiento legal dado por la ley y los tribunales a los agentes del BPBA no es contrario a su naturaleza autónoma.

**II.1. El diverso tratamiento jurisprudencial dado por los tribunales a los casos en los que la parte en juicio es el BPBA y aquellos otros en los que lo es la Provincia de Buenos Aires**

45. La autonomía del BPBA y su consiguiente separación respecto de la Provincia de Buenos Aires se ven reflejadas de manera clara en aquellos precedentes judiciales que dan cuenta del diverso tratamiento dado por los tribunales a uno y otro.

46. La Corte Suprema de Justicia de la República Argentina ha entendido que, en virtud del carácter autárquico del BPBA, no es posible confundirlo en un proceso judicial con la Provincia de Buenos Aires. En una causa iniciada contra el BPBA, la Corte —por remisión al dictamen de la Procuradora Fiscal—, declinó ejercer su jurisdicción originaria al entender que la parte demandada en el caso no era la Provincia de Buenos Aires —sobre la que podía ejercer tal jurisdicción originaria— sino, en cambio, el BPBA. La Corte señaló que la Provincia de Buenos Aires sólo podría considerarse la parte sobre la que procede ejercer la jurisdicción originaria cuando hubiese participado *"nominal y sustancialmente en el pleito —ya sea como actora, demandada o tercero—"* y tuviese en el litigio *"un interés directo, de tal manera que la sentencia que se dicte le resulte obligatoria (Fallos: 311:879 y 1822; 312:1227 y 1457; 313:144; 314:508, entre muchos otros)"*. La Corte dictaminó que *"esa calidad de parte debe surgir, en forma manifiesta, de la realidad jurídica, más allá de la voluntad de los litigantes en sus expresiones formales (Fallos: 307:2249; 308:2621; 314:405)"*. En ese caso, la Corte entendió que la provincia no era parte porque *"el actor dirige su pretensión contra el Banco de la Provincia de Buenos Aires"*, el cual es *"una institución autárquica de Derecho Público"* con *"capacidad para adquirir derechos y contraer obligaciones"*, por lo cual tiene *"una individualidad jurídica y funcional que permite distinguirla del Estado local"*. La Corte concluyó que *"[e]n tales condiciones, . . . la Provincia de Buenos Aires no integra la litis en*

*los términos del artículo 117 de la Constitución Nacional*" y declinó su competencia originaria[60].

47. Cabe en este punto poner de resalto la errónea y parcial interpretación efectuada por las Demandantes del criterio sentado por la Corte Suprema de Justicia de la República Argentina en el precedente recaído en la causa "Banco de la Provincia de Buenos Aires c/ Nación Argentina", del 15/03/1940[61]. Las Demandantes citan a este caso para apoyar su argumento de que la Corte Suprema de Justicia "ha reconocido" que las "atribuciones" del BPBA "definen y perfilan una institución de estado y no un banco particular en que sus constituyentes o fundadores aportan capitales con el fin de formar una sociedad de las autorizadas por el Código de Comercio, para realizar operaciones bancarias conocidas y comunes". (Demanda ¶ 62.)

48. Ante todo, cabe señalar que dicho precedente no resulta en absoluto de aplicación al caso pues no guarda relación alguna con la cuestión que aquí se debate. En efecto, aquél precedente versa sobre la validez constitucional o no de las leyes 11.586 y 11.682 —en cuanto gravaban los dividendos que el BPBA abonaba sobre las acciones que forman su capital—, sin que se encontrara en juego, en cambio, la autonomía del BPBA establecida en su Carta Orgánica.

49. Ahora bien, no obstante lo señalado en el punto anterior, se advierte que el criterio jurisprudencial emanado de dicho precedente citado por las Demandantes —lejos de validar el criterio sostenido por éstas—, confirma la autonomía que para el tribunal tiene el BPBA respecto de la Provincia de Buenos Aires. Es que, en dicho precedente, tras dejar en claro que

---

[60] CSJN, "Romero, Gerardo Luis c/ Banco de la Provincia de Buenos Aires y otro s/ daños y perjuicios", 07/09/1999, Fallos: 322:2105. (**Anexo 13**, Fallos: 322:2105.)

[61] Fallos: 186:170. (**Anexo 14**, Fallos: 186:170.)

*"las exenciones de impuestos establecidas en la ley orgánica del Banco de la Provincia de Buenos Aires. . .deben ser respetadas por las autoridades nacionales, pues gozan de la misma supremacía que corresponde a las disposiciones de orden constitucional sobre las leyes nacionales y provinciales, a mérito de lo dispuesto por los arts. 31 y 104, Carta Fundamental y 2 y 3 , ley 1029",* la Corte Suprema de Justicia añadió —en lo que aquí importa y reafirmando la autonomía del BPBA—, que *"sería un error creer que, para usar de la facultad constitucional de fundar un banco de Estado, sea indispensable poner su administración directamente en manos de los poderes públicos".* Como podrá advertirse, lejos de sustentar el criterio sostenido en autos por las Demandantes, en los precedentes citados la Corte Suprema de Justicia de la República Argentina reivindicó la autonomía de la que goza el BPBA respecto de los poderes públicos de la Provincia de Buenos Aires.

## II.2. El tratamiento tributario y fiscal dado por la ley y los tribunales al BPBA no es contrario a su naturaleza autónoma

50. Lo expuesto hasta aquí no se ve alterado por la exención tributaria establecida a favor de los actos e instrumentos del BPBA en el art. 4 de la Carta Orgánica del BPBA. En dicha norma se dispone que *"[e]l Banco, sus bienes, actos, contratos y operaciones y derechos que de ellos emanen a su favor, están exentos de todo gravamen, impuesto, carga o contribución de cualquier naturaleza. El Banco abonará exclusivamente el servicio de obras sanitarias, la tasa por alumbrado, limpieza y conservación de la vía pública y la contribución de mejoras".*

51. Es que la exención prevista en la norma transcripta no se basa ni podría basarse en la supuesta y pretendida identidad entre el BPBA y la Provincia de Buenos Aires —como insinúan las Demandantes (Demanda ¶ 63)—, sino, más bien, en el reconocimiento de la inmunidad fiscal de los actos e instrumentos del BPBA ante la forma federal de estado adoptada por los

Convencionales Constituyentes de la República Argentina. En efecto, como lo explica la doctrina, *"al coexistir* [en la República Argentina] *un Estado central y varios locales, cada uno con sus propias potestades tributarias, se genera la posibilidad —más real que remota— de que cada uno de ellos grave los actos, contratos, instrumentos, medios y/o las operaciones que realiza el o los otros, alterándose así el normal funcionamiento de sus instituciones y amenazando los objetivos proyectados. De esta manera, a través del instituto en cuestión* [la exención] *se busca evitar tal desavenencia, lo cual no siempre resulta tarea sencilla"*[62].

52. El mencionado sentido de la exención prevista en el art. 4 de la Carta Orgánica del BPBA fue reconocido por los tribunales en diversos precedentes. En efecto, al analizar la validez de la pretensión del Fisco Nacional de gravar las utilidades de las acciones correspondientes a parte del capital del BPBA y los intereses de los bonos emitidos como resultado de los préstamos hipotecarios otorgados, en el precedente "Banco de la Provincia de Buenos Aires c/ Nación Argentina", del 15/03/1940[63], la Corte Suprema de Justicia de la República Argentina reconoció que la exención prevista en la Carta Orgánica del BPBA es evidencia de la naturaleza independiente del Banco. Mas precisamente, sostuvo que *"estas exenciones, consecuencia de la facultad conferida a la Provincia por el pacto de 1859 de legislar sobre su banco, deben ser receptadas por las autoridades nacionales, pues gozan de la misma supremacía que corresponde a las disposiciones de orden constitucional sobre las leyes nacionales y provinciales."* La Corte agregó que la exención legal *"ha tenido como principal objeto impedir*

---

[62] DELLA PICCA, Pablo Hernán, "La inmunidad fiscal del Banco de la Provincia de Buenos Aires", Revista Electrónica del Instituto de Investigaciones "Ambrosio L. Gioja", Año IX, Número 14, 2015. (**Anexo 15**, Della Picca.)

[63] CSJN, "Banco de la Provincia de Buenos Aires c/ Estado Nacional", 15/03/1940, Fallos: 186:170. (**Anexo 14**, Fallos: 186:170.)

*que autoridades extrañas ejerciten sobre aquellos* [los instrumentos del BPBA]*, un contralor de naturaleza tal que le haga perder la independencia necesaria para llenar sus fines"*.

53. Lo expuesto hasta aquí es a tal punto así que la exención prevista en el art. 4 de la Carta Orgánica del BPBA no es de carácter absoluto, sino que los tribunales han reconocido excepciones. En efecto, en numerosas ocasiones los tribunales argentinos han exceptuado dicha exención. Ello es lo que ocurrió, por caso, en "Banco de la Provincia de Buenos Aires c/ Dirección General Impositiva", del 11/12/2007, en el cual la Corte Suprema de Justicia de la República Argentina convalidó la pretensión fiscal de tener al BPBA como contribuyente del impuesto al valor agregado (Fallos: 330:4988) (**Anexo 16**, Fallos: 330:4988.) En el mismo sentido, en el precedente "Banco de la Provincia de Buenos Aires c/ Boullhensen, Pedro A.", del 08/04/2021[64], aquel tribunal rechazó la pretensión del BPBA, fundada en la inmunidad bajo estudio, de ser eximida del pago de la tasa de justicia por la promoción de una acción judicial.

54. Nada de lo expuesto hasta aquí se ve alterado por la jurisprudencia citada por las Demandantes en su Demanda. En efecto, a poco que se analiza el precedente "Ignacio, Mónica Rosana c/ Banco de la Provincia de Buenos Aires s/ pretensión indemnizatoria – empl. público – cuestión de competencia art. 7 ley 12.008", se advierte que allí la Suprema Corte de Justicia de la Provincia de Buenos Aires no se expidió sobre la naturaleza del BPBA; muchos menos sostuvo —como lo señalan las Demandantes— que el BPBA constituya un auténtico apéndice de la Provincia de Buenos Aires (*"constitute [a] true bod[y] of the State"*) (Demanda ¶ 64). Más aun, a poco se repasa dicho precedente se advierte que aquél en nada se relaciona con el caso que nos ocupa, pues allí la Suprema Corte de Justicia de la Provincia de Buenos Aires se limitó

---

[64] Fallos: 344:421. (**Anexo 17**, Fallos: 344:421.)

a resolver un conflicto de competencia para entender en una causa de daños y perjuicios iniciada contra el BPBA por supuesto acoso laboral.

55. Se advierte, entonces, que la exención prevista en el art. 4 de la Carta Orgánica del BPBA no se contrapone a la naturaleza autónoma del BPBA.

## II.3. La sujeción de la actividad comercial y financiera del BPBA a los mismos regímenes normativos que cualquier otra entidad financiera y bancaria

56. La autonomía del BPBA como entidad financiera y su consiguiente separación respecto de la Provincia de Buenos Aires también se ven reflejadas en aquellos precedentes por los que se somete la actividad comercial y financiera del BPBA a los mismos regímenes normativos que cualquier otra entidad financiera y bancaria. Estos regímenes no resultan de aplicación a la Provincia de Buenos Aires.

57. En este punto cabe remarcar que, más allá de su carácter de agente financiero de la Provincia de Buenos Aires y de las competencias que dicho rol implica —reseñadas más arriba—, en la Carta Orgánica del BPBA también se faculta al BPBA a realizar actividades típicamente bancarias y comerciales, como la concesión de préstamos a privados y la realización de inversiones y operaciones en el mercado financiero.

58. En efecto, se establece en la Carta Orgánica del BPBA que *"[e]l Banco en su Sección Bancaria, podrá realizar todas las operaciones que el Directorio juzgue convenientes y que no estando prohibidas por esta u otras leyes pertenezcan por su naturaleza al giro común de los establecimientos bancarios"*, agregando que *"[p]romoverá la economía nacional, preferentemente de las industrias fundamentales de la Provincia y la estabilidad monetaria en*

-25-

*cuando pueda gravitar su acción"*[65]. Asimismo, en la Carta Orgánica se faculta al BPBA a *"otorgar tipos especiales de préstamos destinados al incremento de la agricultura, forestación, ganadería, industria, pesca, construcción de silos y elevadores y otras actividades de interés para el desarrollo de la economía provincial, aplicando tasas y plazos preferenciales en las condiciones que determine el Directorio"*[66] y a acordar créditos que *"podrán destinarse a financiar proyectos de Promoción Industrial, Agroindustrial y/o infraestructura en el territorio de la Provincia de Buenos Aires"*[67].

59. Lo dispuesto en las normas transcriptas se ve reflejado claramente en la práctica bancaria y financiera del BPBA, pues el BPBA ofrece a sus clientes y al público en general los mismos productos y servicios que ofrece cualquier otro banco del sistema financiero de la República Argentina, ya sea que se trate de un banco privado o público, nacional o provincial.

60. En este sentido, la separación entre el BPBA y la Provincia de Buenos Aires también surge de manera clara, pues —como lo tienen dicho los tribunales—, al llevar a cabo actividad comercial, el BPBA se encuentra sujeto, como cualquier otra entidad bancaria, a las normas que rigen toda actividad comercial y financiera en la República Argentina. Esas normas incluyen la Ley 21.526, Nacional de Entidades Financieras; la Ley 25.246, de Prevención y Control de Lavado de Activos y del Financiamiento del Terrorismo; la Ley 24.240, Nacional de Defensa del Consumidor y la Ley 26.831 (**Anexo 18**, Ley 26.831), de Mercado de Capitales, entre otras.

---

[65] Art. 31, Carta Orgánica del BPBA.

[66] Art. 33, Carta Orgánica del BPBA.

[67] Art. 87, Carta Orgánica del BPBA.

61. La Corte Suprema de Justicia ha confirmado que estas normas se aplican al BPBA. Por ejemplo, confirmó, por mayoría, las multas que había aplicado la Dirección Nacional de Comercio Interior al BPBA: una, por infracción a los arts. 4 y 19 de la ley 24.240, Nacional de Defensa del Consumidor (a raíz de un cargo que había sido aplicado sin previsión contractual), y la otra, por transgresión al art. 27 de la ley 25.065 (**Anexo 19**, Ley 25.065), Nacional de Tarjeta de Crédito (en tanto no se cumplió el procedimiento para cuestionar la liquidación de la tarjeta). En lo que ahora interesa, en aquella ocasión la mayoría de la Corte Suprema de Justicia de la República Argentina confirmó que el BPBA puede ser sancionado igual que cualquier otro banco, sosteniendo que *"lo decidido no afecta . . . el status jurídico de la entidad bancaria local como institución autárquica de derecho público ni limita las exenciones de las que goza en virtud de la reserva constitucional, en tanto los privilegios invocados no guardan relación con el comportamiento del banco respecto del cumplimiento de normas de derecho común"* como las leyes de competencia y de tarjetas de crédito, *"frente a la vulneración de las garantías constitucionales de los consumidores"*[68].

62. En la misma línea, la Cámara Nacional de Apelaciones en lo Contencioso Administrativo Federal confirmó que el BPBA se encontraba alcanzado y obligado por las disposiciones de la entonces vigente Ley 22.802 (**Anexo 21**, Ley 22.802), Nacional de Lealtad Comercial. En lo que ahora interesa, en dicha ocasión el tribunal sostuvo —con citas de otros precedentes anteriores— que el BPBA podría ser sancionado por violaciones de dicha ley ya que *"las exenciones de que goza la entidad bancaria, en virtud de la reserva efectuada en el actual*

---

[68] CSJN, "Banco de la Provincia de Buenos Aires c/ Dirección Nacional de Comercio Interior - Disposición 622/05 [expediente 29.184/02]", 19/03/2014, Fallos: 337:205. (**Anexo 20**, Fallos: 337:205.)

*artículo 121 de la Constitución Nacional, no se ven afectadas*" por la imposición de la multa al banco. Concretamente, la multa "*no atenta contra su status jurídico de raigambre constitucional, como institución autárquica del derecho público (artículo primero del decreto ley N° 9166/86 y C.S.J.N., en Fallos: 313:164)*"[69].

63. En otro precedente la Cámara Nacional de Apelaciones en lo Contencioso Administrativo Federal entendió, asimismo, que el BPBA —precisamente por constituir una institución financiera—, se encontraba sujeto a la regulación financiera y cambiaria como cualquier otra entidad de esa naturaleza. En ese sentido, el tribunal confirmó la multa que le había sido aplicada al BPBA por el Banco Central de la República Argentina con fundamento en la violación al deber de entrega de monedas al público[70].

64. En la misma línea, la Cámara Nacional de Apelaciones en lo Contencioso Administrativo Federal sostuvo que el BPBA se hallaba sujeto a la regulación federal referida a la prevención de lavado de activos y financiamiento del terrorismo contenida en la Ley 25.246, de Prevención y Control de Lavado de Activos y Financiamiento del Terrorismo y en sus normas reglamentarias y complementarias. En este sentido, el tribunal confirmó la Resolución nº 55/20, por la cual la Unidad de Información Financiera había sancionado con multas al BPBA y a sus directores a tenor de lo dispuesto en el art. 24, incs. 1° y 3°, de la ley 25.246, por la inobservancia a la normativa de prevención del lavado de activos y financiación del terrorismo.

---

[69] CNFed. CA., Sala II, "Banco de la Provincia de Buenos Aires c/ Dirección Nacional de Comercio Interior - Disp. 548/10 (Expte. S01:86.248/08)", 22/03/2011, TR LA-LEY AR/JUR/17291/2011. (**Anexo 22**, Expte. S01:86.248/08.)

[70] CNFed. CA., Sala III, "Banco de la Provincia de Buenos Aires c/ Banco Central de la República Argentina – Resol. 206/08 [expte. 100488/08 SUM FIN 1241]", 08/06/2010. (**Anexo 23**, Expte. 100488/08 SUM FIN 1241.)

En aquella ocasión el tribunal confirmó que una institución autárquica de derecho público como el BPBA sigue sujeta a las mismas regulaciones que otros bancos, sosteniendo que *"la actuación de la autoridad nacional (en el caso, la UIF), en cumplimiento de una norma también nacional (ley 25.246 y su reglamentación), no se contrapone con la reserva efectuada por la Provincia de Buenos Aires. . .de legislar y gobernar su banco, y tampoco afecta el estatus jurídico de la entidad bancaria como institución autárquica de derecho público, ni limita las exenciones de que goza"*[71].

## II.4. La sujeción de la actividad comercial y financiera del BPBA a la competencia de los mismos tribunales que cualquier otra entidad financiera y bancaria

65. La autonomía del BPBA, como entidad financiera y bancaria, también puede verse reflejada en aquellos precedentes judiciales a través de los cuales se somete su actividad comercial y financiera a la competencia de los mismos tribunales que cualquier otra entidad financiera y bancaria.

66. Antes de adentrarnos en este punto, cabe recordar que, en virtud del sistema federal de gobierno establecido en la Constitución[72], la República Argentina cuenta con tribunales federales y provinciales. Los tribunales federales tienen competencia en las causas que versen sobre puntos regidos por la Constitución, por las leyes federales y por los tratados celebrados con potencias extranjeras, incluyendo también los conflictos suscitados entre provincias o entre una provincia

---

[71] CNFed. CA., Sala II, "Banco de la Provincia de Buenos Aires c/ UIF s/ Código Penal – Ley 25.246 – Dto. 290/07 Art 25" y "Helguero Marta Elena y otros c/ UIF s/ Código Penal – Ley 25.246 – Dto. 290/07 – Art. 25", 17/11/2021, Expte. 127/21. (**Anexo 24**, Expte. 127/21.)

[72] Art. 1, Constitución de la Nación Argentina. (**Anexo 25**, Constitución de la República Argentina.)

y el Estado federal[73]. Por su parte, los tribunales provinciales y los locales de la Ciudad Autónoma de Buenos Aires ejercen jurisdicción sobre todas aquellas materias no reservadas a la justicia federal y resuelven disputas regidas por el derecho local[74]. Es así que cada provincia y la Ciudad Autónoma de Buenos Aires organizan su propio poder judicial, cuyos tribunales son independientes del sistema judicial federal.

67. A su vez, la organización del sistema judicial dentro de cada uno de esos órdenes —federal y provincial—, está compuesta por tribunales especializados en distintas materias, tales como, por ejemplo, civil, comercial, contencioso-administrativo, penal y laboral. En lo que ahora interesa, la competencia civil y comercial abarca los conflictos regidos por el derecho privado, como aquellos derivados de contratos celebrados entre privados, responsabilidad civil, derechos reales y cuestiones societarias. En cambio, la competencia en lo contencioso-administrativa se refiere a los litigios relacionados preponderantemente con el derecho público-administrativo, como ser, por ejemplo, aquellos en los que se discute la validez, interpretación y aplicación de actos administrativos, reglamentos y decisiones de la administración pública; aquellos relacionados con reclamos por daños y perjuicios derivados de la actuación u omisión del Estado por el ejercicio de la función pública, etcétera. En suma, la diferencia fundamental radica en el marco jurídico aplicable: mientras que la competencia civil y comercial involucra cuestiones vinculadas con normas de derecho privado, la competencia en lo contencioso-

---

[73] Art. 116, Constitución de la Nación Argentina. (**Anexo 25**, Constitución de la Nación Argentina.)

[74] Arts. 5 y 121, Constitución de la Nación Argentina. (**Anexo 25**, Constitución de la Nación Argentina.)

administrativa, en cambio, se centra en los casos regidos preponderantemente por normas de derecho público-administrativo.

68. Ahora bien, en aquellos casos en los que los particulares demandan al BPBA el cumplimiento de contratos comerciales previamente celebrados —por ejemplo, de cuenta corriente bancaria, de caja de ahorro, de préstamos bancarios con o sin garantías, etcétera—, se ha reconocido la competencia de la justicia ordinaria en materia comercial o civil, según corresponda; ello, tal como ocurriría si aquella demanda fuera dirigida contra cualquier otro banco o entidad del sistema financiero argentino.

69. Por ejemplo, los tribunales entendieron que la acción iniciada por un cliente contra el BPBA tendiente al cobro de una indemnización —con motivo del rechazo de un cheque por falta de fondos—, debía tramitar ante los tribunales con competencia comercial. Para ello se sostuvo, en lo que aquí interesa, que *"en los hechos descriptos en la demanda subyace la relación contractual eminentemente mercantil que vinculara a las partes, referida a la operatoria de una cuenta corriente bancaria, y en tal sentido resulta pertinente, entonces, como bien lo puntualizara el fiscal de Cámara en su dictamen, someter este juicio que versa sobre cuestiones de naturaleza comercial, a procedimientos adecuados a la índole de esos asuntos y tribunales especializados en la materia"*[75].

70. En la misma línea, en aquellos otros casos en los que el BPBA promueve una acción judicial en contra de sus deudores privados y sobre la base de normas de derecho común, el BPBA acude para ello por ante los tribunales con competencia ordinaria en lo comercial o civil, tal

---

[75] CNCiv., Sala A, "Méndez, Horacio A. c/ Banco de la Provincia de Buenos Aires", LA LEY 1999-C, p. 43 y DJ 2000-1, p. 426. (**Anexo 26**, AR/JUR/212/1998.)

como lo hacen, en idénticos supuestos, todos los bancos y entidades del sistema financiero argentino. Fue, así, por ejemplo, que tramitó ante la Cámara Nacional de Apelaciones en lo Comercial el proceso ejecutivo promovido por el BPBA contra un usuario persiguiendo el cobro de una suma de dinero derivada de un contrato de mutuo otorgado mediante el sistema de Unidad de Valor Adquisitivo[76].

71. En la misma línea, tramitó ante los tribunales con competencia en lo Civil y Comercial de La Plata la demanda promovida por el BPBA contra un cliente tendiente a obtener el cobro forzoso de determinadas sumas de dinero por las deudas provenientes de las tarjetas de crédito Visa y MasterCard y del saldo deudor de la cuenta corriente[77].

72. Por último, cabe poner de resalto que en aquellos excepcionales supuestos en los que el BPBA fue demandado ante los tribunales federales de la República Argentina, ello se debió —no a la circunstancia de que fuera demandado el BPBA—, sino al hecho de que en la causa se dirimían cuestiones de naturaleza federal. Por caso, la Corte Suprema de Justicia de la República Argentina entendió que debía tramitar por ante la justicia federal la causa por la cual un cliente del BPBA cuestionaba la constitucionalidad de normas federales, como ser el Decreto 36/90 y la Ley 23.697, a través de los cuales se había ordenado el reintegro de los plazos fijos en BONEX[78]. En la misma línea, la Suprema Corte de Justicia de la Provincia de Buenos Aires

---

[76] CNCom., Sala C, "Banco de la Provincia de Buenos Aires c/ Rojas, Marcelo Alejandro s/ ejecutivo", 17/12/2024, AR/JUR/198568/2024. (**Anexo 27**, AR/JUR/198568/2024.)

[77] CA. Civ. y Com. La Plata, Sala II, "Banco de la Provincia de Buenos Aires c/ Laborda, Walter Gastón s/ cobro sumario de sumas de dinero", 09/05/2024, AR/JUR/62182/2024. (**Anexo 28**, AR/JUR/62182/2024.)

[78] CSJN, "Uriarte, Fernando Carlos c/ Banco de la Provincia de Buenos Aires", 04/06/1991, Fallos: 314:508. (**Anexo 18**, Fallos: 314:508.)

sostuvo que el motivo por el cual debía tramitar ante los tribunales federales la acción de amparo promovida contra el BPBA para el cumplimiento forzoso de la Comunicación BCRA 3398 —y que, por ende, se lo obligara a recibir ciertos bonos en carácter de pago cancelatorio—, era que aquélla versaba sobre el cumplimiento de normas federales del Banco Central de la República Argentina[79].

## II.5. El tratamiento legal dado por la ley y los tribunales a los agentes del BPBA es consistente con su naturaleza autónoma

73. Por último, no es correcto lo sostenido por las Demandantes en este caso en el sentido que el BPBA y la Provincia son *alter egos* porque "los tribunales argentinos tratan a los empleados del Banco Provincia como empleados públicos o funcionarios públicos" y porque "el tribunal administrativo de la Provincia tiene competencia sobre las disputas entre el Banco y sus empleados" (Demanda ¶¶ 66–67.) Como veremos enseguida, la autonomía del BPBA y su consiguiente separación de la Provincia de Buenos Aires es consistente con el hecho de que algunos aspectos de su accionar —en lo que ahora interesa, la relación de empleo con sus empleados— se encuentren regidos por el derecho público y, por ende, sometidos a la competencia de los tribunales en lo contencioso administrativo.

---

[79] SCBA, "Álvarez, Oscar y otro c/ Banco de la Provincia de Buenos Aires", 24/03/2004, La Ley Online [TR LALEY AR/JUR/1317/2004] (**Anexo 29**, AR/JUR/1317/2004); *ver también*, "Audine, María Beatriz c/ Banco de la Provincia de Buenos Aires", 24/03/2004, La Ley Online [LALEY AR/JUR/1300/2004] (**Anexo 30**, AR/JUR/1300/2004); entre muchos otros.

**a) Aplicación del derecho público, aunque diverso del aplicable a los agentes de la Provincia de Buenos Aires**

74. Entre las consecuencias derivadas de la distinción entre el derecho público y el derecho privado, en los países del sistema continental europeo suele diferenciarse entre las personas de derecho privado y las de derecho público. En este sentido, en el art. 145 del Código Civil y Comercial de la República Argentina se establece que las personas jurídicas pueden ser públicas o privadas. (**Anexo 31**, Código Civil y Comercial de la República Argentina.)

75. Entre las *personas de derecho público* enunciadas en el Código Civil y Comercial de la República Argentina se encuentran el Estado nacional, las provincias, la Ciudad Autónoma de Buenos Aires, los municipios y —en lo que ahora interesa—, las entidades autárquicas y las demás organizaciones constituidas en la República Argentina a las que el ordenamiento jurídico atribuya ese carácter[80]. En resumidas cuentas, lo que caracteriza a las personas de derecho público es el hecho de regirse, en cuanto a su reconocimiento, comienzo, capacidad, funcionamiento, organización y fin de su existencia, por leyes y normas de derecho público —más precisamente, los de su constitución[81]—, sin perjuicio del derecho aplicable a las relaciones jurídicas que aquéllas entablen.

76. El art. 1 de la Carta Orgánica del BPBA dispone que *"[e]l Banco de la Provincia de Buenos Aires es institución autárquica de derecho público, en su carácter de Banco de Estado"*. A la luz de lo expuesto más arriba ello solo implica que lo relativo al reconocimiento, comienzo,

---

[80] Art. 146, Código Civil y Comercial de la República Argentina. (**Anexo 31**, Código Civil y Comercial de la República Argentina.)

[81] Art. 147, Código Civil y Comercial de la República Argentina. (**Anexo 31**, Código Civil y Comercial de la República Argentina.)

capacidad, funcionamiento, organización y fin de la existencia del BPBA se regirá por el derecho público. Pero, como tiene dicho la Corte Suprema de Justicia de la República Argentina —y se sostuvo más arriba—, ello *"no guarda relación con el comportamiento del banco respecto del cumplimiento de normas de derecho común y frente a la vulneración de las garantías constitucionales de los consumidores"*[82].

77. El vínculo existente entre el BPBA y sus propios agentes también se encuentra regido por normas de derecho público; más precisamente, por el Estatuto para el Personal del BPBA y por el Reglamento de Disciplina para el Personal del BPBA, reglamentos estos aprobados por el Directorio del propio BPBA en uso de las facultades conferidas por el art. 24, inc. i), de la Carta Orgánica del BPBA.

78. La aplicación de estas y otros normas de derecho público al BPBA no significa que aquél constituya un *alter ego* de la Provincia de Buenos Aires. Antes bien, de acuerdo con lo dispuesto en el art. 147 del Código Civil y Comercial de la República Argentina (**Anexo 31**, Código Civil y Comercial de la República Argentina), la aplicación de normas de derecho público al BPBA obedece al carácter de *"institución autárquica de derecho público"* que le ha sido asignado por el art. 1 de la Carta Orgánica del BPBA.

79. Esto último se ve confirmado por el hecho de que las normas de derecho público aplicables a la Provincia de Buenos Aires y al BPBA no son las mismas, sino que se les aplica regulaciones distintas. Por ejemplo, continuando con las normas que rigen a la relación de empleo público, mientras que la relación laboral trabada entre la Provincia de Buenos Aires y sus agentes se

---

[82] CSJN, "Banco de la Provincia de Buenos Aires c/ Dirección Nacional de Comercio Interior - Disposición 622/05 [expediente 29.184/02]", 19/03/2014, Fallos: 337:205. (**Anexo 20**, Fallos: 337:205.)

encuentra regida por la Ley 10.430 (**Anexo 32**, Ley 10.430), de Empleo Público Provincial —aplicándose a dichos trabajadores el Convenio Colectivo de Trabajo y aportando éstos al Instituto de Previsión Social de la Provincia (IPS)—, la relación jurídica existente entre el BPBA y sus agentes, en cambio, se encuentra regida por el Estatuto para el Personal del BPBA y por el Reglamento de Disciplina para el Personal del BPBA, ambos reglamentos aprobados por el Directorio del BPBA en uso de las facultades conferidas por el art. 24, inc. i), de la Carta Orgánica del BPBA. A su vez, los empleados del BPBA se encuentran sujetos al Convenio Colectivo de Trabajo 18/75 —por su carácter de empleados bancarios— y aportan a la Caja de Jubilaciones del BPBA.

80. En suma, si bien es cierto que resulta de aplicación al BPBA ciertas normativas de derecho público, ello obedece al carácter de *"institución autárquica de derecho público"* que se le asigna en el art. 1 de la Carta Orgánica del BPBA y no, en cambio, a la circunstancia de que aquél constituya un *alter ego* o un mero apéndice de la Provincia de Buenos Aires. A tal punto es ello así que, como se lo ha señalado, las normas de derecho público aplicables a uno y otro resultan distintas.

**b) Consiguiente competencia de los tribunales en lo contencioso administrativo**

81. En los países del sistema continental europeo el régimen jurídico aplicable a un determinado caso suele condicionar —entre otras cosas—, la competencia material del tribunal que habrá de intervenir en él. En este sentido, se ha dicho que *"la competencia del juez federal*

*contencioso administrativo . . . es delimitada por la aplicación de las normas de derecho*

*público (Derecho Administrativo) . . .”*[83].

82. Siguiendo este criterio, en el art. 1 del Código Contencioso Administrativo de la Provincia de

Buenos Aires, aprobado por la Ley 12.008 (t.o. Ley 13.101), se establece que *“[c]orresponde*

*a los tribunales contencioso administrativos el conocimiento y decisión de las pretensiones*

*que se deduzcan en los casos originados por la actuación u omisión, en el ejercicio de*

*funciones administrativas, de los órganos de la Provincia, los Municipios, los entes*

*descentralizados y otras personas, con arreglo a las prescripciones del presente Código”*[84].

Para ello, se agrega a renglón seguido, que *“[l]a actividad de los órganos del Poder Ejecutivo,*

*de los Municipios y de los demás entes provinciales o municipales, se presume realizada en el*

*ejercicio de funciones administrativas y regida por el derecho administrativo”*[85].

83. En función de lo señalado y lo dispuesto en las normas transcriptas, son los tribunales

provinciales con competencia en lo contencioso administrativo los que deben entender en las

causas judiciales promovidas por o en contra del BPBA y en las que resulte aplicable el derecho

público; entre ellas, por ejemplo, las suscitadas en el marco de una relación de empleo público.

84. Ahora bien, la circunstancia mencionada —esto es, que las causas suscitadas entre el BPBA y

sus agentes tramiten en los tribunales con competencia en lo contencioso administrativa de la

Provincia de Buenos Aires—, no significa que el BPBA sea un *alter ego* o un mero apéndice

---

[83] BALBÍN, Carlos F., Curso de Derecho Administrativo, La Ley, Buenos Aires, 2008, Tomo II, p. 743–744. (**Anexo 33**, Balbín, 2008.)

[84] Art. 1, Código Contencioso Administrativo de la Provincia de Buenos Aires. (**Anexo 34**, Ley 12.008.)

[85] Art. 2, Código Contencioso Administrativo de la Provincia de Buenos Aires. (**Anexo 34**, Ley 12.008.)

de la Provincia de Buenos Aires. Antes bien, dicha competencia en lo contencioso administrativo deriva del mero hecho de que la relación laboral trabada entre el BPBA y sus empleados también se encuentra regida por el derecho público.

85. Incluso más, a poco que se repasa la jurisprudencia provincial se advierte que el tratamiento dado por los tribunales locales en lo contencioso administrativos a los casos dirigidos contra el BPBA difiere abiertamente del dado a aquellos otros promovidos contra la Provincia de Buenos Aires, al punto que se ocupan de distinguir cuidadosamente el diferente marco normativo aplicable a las relaciones jurídicas suscitadas en uno y otro caso.

86. Por ejemplo, en un precedente emitido en el marco de una causa de empleo público dirigida contra el BPBA, la Suprema Corte de la Provincia de Buenos Aires sostuvo que *"el caso resulta de competencia de los tribunales en lo contencioso administrativo"* porque se trataba de un empleado del Banco de la Provincia de Buenos Aires[86].

87. En suma, sin perjuicio de lo expuesto en el acápite I —en cuanto a la autonomía del BPBA consagrada en el art. 8 de la Carta Orgánica del BPBA y garantizada a lo largo de todo su articulado—, dicha autonomía del BPBA y la consiguiente separación respecto de la Provincia de Buenos Aires también puede verse reflejada en la jurisprudencia de los tribunales de la República Argentina.

Declaro bajo pena de perjurio de conformidad con las leyes de los Estados Unidos de América que lo anterior es verdadero y correcto.

---

[86] SCBA, "García, José c/ Banco de la Provincia de Buenos Aires s/Despido", 05/09/2012, causa L 107398, se encuentra disponible en https://juba.scba.gov.ar/VerTextoCompleto.aspx?idFallo=69980. (**Anexo 35**, Fallo: 69980.)

Ejecutado en Buenos Aires, Argentina, el 28 de febrero de 2025.

_____
Juan Antonio Stupenengo